IN THE UNITED STATES COURTS OF APPPEALS
FOR THE
DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| VERMONT INFORMATION PROCESSING, INC. | ) ) | |
| *Petitioner*, | ) ) | |
| v. | ) ) | NO. 24-1360 |
| NATIONAL LABOR RELATIONS BOARD, | ) ) ) | |
| *Respondent.* | ) | |

# **PETITION FOR REVIEW**

Pursuant to 29 C.F.R. § 101.14 and F.R.A.P. 15(a), Petitioner Vermont Information Processing, Inc. ("VIP") hereby petitions the United States Court of Appeals for the District of Columbia Circuit for review of the Decision and Order entered by Respondent National Labor Relations Board ("Board") on November 5, 2024, in Case 03-CA-301055. A copy of the Decision and Order is attached hereto as *Exhibit A*.

This Court has jurisdiction because the Board's Decision and Order is a final order within the meaning of Section 10(f) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 160(f), and VIP is a party aggrieved by the Decision and Order. Venue properly lies in this Court under NLRA Section 10(f), 29 U.S.C. § 160(f).

As the Board's Decision and Order is contrary to the law, VIP respectfully requests that this Court grant the petition for review, set aside the Board's Decision and Order, and grant VIP any further relief to which it may be entitled.

November 19, 2024

        VERMONT INFORMATION PROCESSING, INC.

        BY:  STRIS & MAHER LLP

        By:    s/ Tillman J. Breckenridge
              Tillman J. Breckenridge, Esq.
              1717 K Street NW, Suite 900
              Washington, DC  20005
              T:  (202) 800-6030
              E:  tbreckenridge@stris.com

IN THE UNITED STATES COURTS OF APPPEALS
FOR THE
DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| VERMONT INFORMATION PROCESSING, INC. | ) ) |
|           *Petitioner*, | ) ) |
| v. | ) NO. _____ |
| NATIONAL LABOR RELATIONS BOARD, | ) ) ) |
|           *Respondent*. | ) |

## **RULE 26.1 CORPORATE DISCLOSURE**

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Petitioner Vermont Information Processing, Inc. hereby states that it is an employee-owned for-profit corporation that builds software and hosts data for the beverage industry. Petitioner has no parent company, and no other corporation owns 10% or more of Petitioner's stock.

November 19, 2024

                                      VERMONT INFORMATION PROCESSING, INC.

                                      BY: STRIS & MAHER LLP

                                      By: s/Tillman J. Breckenridge
                                            Tillman J. Breckenridge, Esq.
                                            1717 K Street NW, Suite 900
                                            Washington, DC 20005
                                            T: (202) 800-6030
                                            E: tbreckenridge@stris.com

NOTICE: This opinion is subject to formal revision before publication in the bound volumes of NLRB decisions. Readers are requested to notify the Executive Secretary, National Labor Relations Board, Washington, D.C. 20570, of any typographical or other formal errors so that corrections can be included in the bound volumes.

**Vermont Information Processing, Inc.** *and* **Christopher Bendel and Gordon Dragoon and Kaleb Noble and Kestrel Swift.** Case 03–CA–301055

November 5, 2024

DECISION AND ORDER

BY CHAIRMAN MCFERRAN AND MEMBERS PROUTY AND WILCOX

On July 31, 2023, Administrative Law Judge Arthur J. Amchan issued the attached decision. The Respondent filed exceptions and a supporting brief, the General Counsel and the Charging Parties each filed answering briefs, and the Respondent filed reply briefs.

The National Labor Relations Board has delegated its authority in this proceeding to a three-member panel.[1]

The Board has considered the decision and the record in light of the exceptions and briefs[2] and has decided to affirm the judge's rulings,[3] findings,[4] and conclusions[5] and to adopt the recommended Order as modified.[6]

CONCLUSIONS OF LAW

1. Respondent is an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

2. Respondent violated Section 8(a)(1) of the Act by discharging employees Christopher Bendel, Gordon Dragoon, Kaleb Noble, and Kestrel Swift because of their protected concerted activities.

---

[1] The Respondent has requested oral argument. The request is denied, as the record, exceptions, and briefs adequately present the issues and the positions of the parties.

[2] The General Counsel moves to strike the Respondent's brief in support of its exceptions on the ground that it fails to comply with the Board's Rules and Regulations in that it does not contain references to the specific exceptions to which its arguments relate. Although the Respondent's brief does not comply in all particulars with Sec. 102.46(a)(2), we accept it because the Respondent's brief is otherwise substantially compliant. See, e.g., *Michael Cetta, Inc. d/b/a Sparks Restaurant*, 366 NLRB No. 97, slip op. at 1 fn. 2 (2018), enfd. 805 Fed.Appx. 2 (D.C. Cir. 2019).

[3] We reject the Respondent's argument that the judge failed to adequately address a purported violation of his sequestration order. Specifically, the Respondent asserts that one or more discriminatees surreptitiously accessed the virtual hearing while Manager Chris McGinty testified on direct examination during the Respondent's case-in-chief. It was not (and is not) clear that any of the discriminatees did so. In any event, the judge acted within the bounds of his discretion when he ruled that, if any party were to recall the discriminatees to the stand, the judge would permit the Respondent to ask them whether they had violated the sequestration order, and, if they had, the judge would then decide upon an appropriate sanction. Ultimately, no party called these discriminatees to testify again. In finding no abuse of discretion, we emphasize that, under longstanding precedent, the Board permits discriminatees to be present during the course of the entire hearing except when other witnesses on behalf of the General Counsel or the charging party are testifying about events as to which the discriminatee will be expected to testify. See, e.g., *Greyhound Lines*, 319 NLRB 554, 554 (1995); *Unga Painting Corp.*, 237 NLRB 1306, 1308 (1978). Further, the Respondent has not demonstrated that the judge's ruling prejudiced its case.

[4] The Respondent has excepted to some of the judge's credibility findings. The Board's established policy is not to overrule an administrative law judge's credibility resolutions unless the clear preponderance of all the relevant evidence convinces us that they are incorrect. *Standard Dry Wall Products*, 91 NLRB 544 (1950), enfd. 188 F.2d 362 (3d Cir. 1951). We have carefully examined the record and find no basis for reversing the findings. In addition, some of the Respondent's exceptions imply that the judge's rulings, findings, and conclusions demonstrate bias and prejudice. On careful examination of the judge's decision and the entire record, we are satisfied that the Respondent's contentions are without merit.

[5] In analyzing the allegation that the Respondent unlawfully discharged Christopher Bendel, Gordon Dragoon, Kaleb Noble, and Kestrel Swift, the judge applied *Wright Line*, 251 NLRB 1083 (1980), enfd. 662 F.2d 889 (1st Cir. 1981), cert. denied 455 U.S. 989 (1982), citing *General Motors*, 369 NLRB No. 127 (2020). *General Motors* was subsequently overruled in *Lion Elastomers*, 372 NLRB No. 83 (2023), vacated and remanded 108 F.4th 252 (5th Cir. 2024). However, the parties here litigated this case under *Wright Line*, and no party argues that an alternative framework should be applied. The General Counsel is always free to proceed on a *Wright Line* theory of liability when challenging the legality of discipline or discharge, even where a violation might also be proven under *Lion Elastomers*. Here, the General Counsel has chosen to proceed under *Wright Line*, and there is no basis to require relitigation of the case under *Lion Elastomers*. Consequently, we affirm the judge's application of the *Wright Line* standard and adopt his findings of violations.

In affirming the judge's finding that the Respondent violated Sec. 8(a)(1) by discharging employee Bendel for disseminating the salary spreadsheet, we also rely on the Respondent's shifting explanations for Bendel's discharge as additional evidence of animus towards his protected concerted activity. We find it unnecessary to rely on the judge's finding that the Respondent's decision to take the salary spreadsheet down almost immediately is sufficient, on its own, to establish the Respondent's animus towards the employees who disseminated the salary spreadsheet.

In affirming the finding that the Respondent violated Sec. 8(a)(1) by discharging employees Dragoon, Noble, and Swift, we clarify that the relevant protected concerted activity that these employees engaged in and for which the Respondent discharged them is their online chat communications about the salary spreadsheet, workplace conditions, and frustration over Bendel's recent discharge.

We do not rely on any implication in the judge's decision that the Respondent's review of the employees' online discussions might have constituted unlawful surveillance, an allegation neither alleged in the complaint nor argued to the Board on exceptions. Nor do we rely on the judge's statement that the Respondent's failure to threaten to sue and to possibly criminally prosecute Dragoon, Noble and Swift for sabotaging its IT systems indicated that the Respondent was not genuinely concerned about sabotage. We adopt the judge's pretext finding for the other reasons that the judge stated.

[6] Because the judge omitted a conclusions of law section from his decision, we have set forth the conclusions of law in full below. In addition, we amend the judge's recommended remedy as discussed below. We shall also modify the judge's recommended Order to conform to the violations found, to the Board's standard remedial language, and in accordance with *Paragon Systems, Inc.*, 371 NLRB No. 104 (2022). We shall substitute a new notice to conform to the Order as modified.

3. Respondent's unfair labor practices affect commerce within the meaning of Section 2(6) and (7) of the Act.

AMENDED REMEDY

Although the judge properly recommended a remedy consistent with our decision in *Thryv, Inc.*, 372 NLRB No. 22 (2022), enf. denied on other grounds 102 F.4th 727 (5th Cir. 2024), he did so using nonstandard language. In accordance with our decision in *Thryv*, the Respondent shall also compensate Christopher Bendel, Gordon Dragoon, Kaleb Noble, and Kestrel Swift for any other direct or foreseeable pecuniary harms incurred as a result of the unlawful termination of their employment, including reasonable search-for-work and interim employment expenses, if any, regardless of whether these expenses exceed interim earnings. Compensation for these harms shall be calculated separately from taxable net backpay, with interest at the rate prescribed in *New Horizons*, 283 NLRB 1173 (1987), compounded daily as prescribed in *Kentucky River Medical Center*, 356 NLRB 6 (2010).[7]

ORDER

The National Labor Relations Board orders that the Respondent, Vermont Information Processing, Inc., Colchester, Vermont, its officers, agents, successors, and assigns, shall take the action set forth in the Order as modified.

1. Substitute the following for paragraph 2(b), delete paragraphs 2(d) and (e), and reletter the subsequent paragraphs.

"(b) Make Christopher Bendel, Gordon Dragoon, Kaleb Noble, and Kestrel Swift whole for any loss of earnings and other benefits, and for any other direct or foreseeable pecuniary harms suffered as a result of the discrimination against them, in the manner set forth in the remedy section of the judge's decision as amended in this decision."

2. Substitute the following for what is currently paragraph 2(i), now relettered as 2(g).

"(g) Post at its facility in Colchester, Vermont, copies of the attached notice marked "Appendix."[8] Copies of the notice, on forms provided by the Regional Director for Region 3, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places, including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by the Respondent to ensure that the notice is not altered, defaced, or covered by any other material. If the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since February 16, 2022."

3. Substitute the attached notice for that of the administrative law judge.

Dated, Washington, D.C.  November 5, 2024

_____
Lauren McFerran,                Chairman

_____
David M. Prouty,                  Member

_____
Gwynne A. Wilcox,                 Member

(SEAL)    NATIONAL LABOR RELATIONS BOARD

APPENDIX

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated the National Labor Relations Act and has ordered us to post and obey this notice.

---

[7] For the reasons set forth in *Airgas USA, LLC*, 373 NLRB No. 102, slip op. at 1 fn. 2 (2024), the Board's decision in *Thryv* remains valid precedent.

[8] If the facility involved in these proceedings is open and staffed by a substantial complement of employees, the notices must be posted within 14 days after service by the Region. If the facility involved in these proceedings is closed or not staffed by a substantial complement of employees due to the Coronavirus Disease 2019 (COVID-19) pandemic, the notices must be posted within 14 days after the facility reopens and a substantial complement of employees has returned to work. If, while closed or not staffed by a substantial complement of employees due to the pandemic, the Respondent is communicating with its employees by electronic means, the notice must also be posted by such electronic means within 14 days after service by the Region. If the notice to be physically posted was posted electronically more than 60 days before physical posting of the notice, the notice shall state at the bottom that "This notice is the same notice previously [sent or posted] electronically on [date]." If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

FEDERAL LAW GIVES YOU THE RIGHT TO

    Form, join, or assist a union

    Choose representatives to bargain with us on your behalf

    Act together with other employees for your benefit and protection

    Choose not to engage in any of these protected activities.

WE WILL NOT discharge, suspend or otherwise discriminate against any of you for engaging in protected concerted activity.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the

exercise of the rights guaranteed you by Section 7 of the Act.

WE WILL, within 14 days from the date of this Order, offer Christopher Bendel, Gordon Dragoon, Kaleb Noble, and Kestrel Swift full reinstatement to their former jobs or, if those jobs no longer exist, to a substantially equivalent position, without prejudice to their seniority or any other rights or privileges previously enjoyed.

WE WILL make Bendel, Dragoon, Noble, and Swift whole for any loss of earnings and other benefits resulting from their unlawful discharge, less any net interim earnings, plus interest, and WE WILL also make them whole for any other direct or foreseeable pecuniary harms suffered as a result of the unlawful discharges, including reasonable search-for-work and interim employment expenses, plus interest.

WE WILL compensate Bendel, Dragoon, Noble, and Swift for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and WE WILL file with the Regional Director for Region 3, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay award to the appropriate calendar years for Bendel, Dragoon, Noble, and Swift.

WE WILL file with the Regional Director for Region 3, within 21 days of the date the amount of backpay is fixed by agreement or Board order or such additional time as the Regional Director may allow for good cause shown, a copy of the corresponding W-2 form(s) for Bendel, Dragoon, Noble and Swift reflecting the backpay award.

WE WILL, within 14 days from the date of this Order, remove from our files any reference to the unlawful discharges of Bendel, Dragoon, Noble, and Swift and WE WILL, within 3 days thereafter, notify them in writing that this has been done and that the discharges will not be used against them in any way.

    VERMONT INFORMATION PROCESSING, INC.

The Board's decision can be found at https://www.nlrb.gov/case/03-CA-301055 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940.



*Abigail Snelling, Desmond D. Metzger,* and *Caroline V. Wolkoff, Esqs. (on brief),* for the General Counsel.

*Stephen D. Ellis* and *Carl "Ott" Lindstrom, Esqs. (on brief) (Paul, Frank & Collins, P.C.*), of Burlington, Vermont, for the Respondent.

*Claudine C. Safar* and *Carly Rippel, Esqs. (Monaghan, Safar, Ducham, PLLC),* of Burlington, Vermont, for the Charging Parties.

## DECISION

### STATEMENT OF THE CASE

ARTHUR J. AMCHAN, Administrative Law Judge. This case was heard via Zoom video technology between June 12 and June 14, 2023. The Charging Parties' attorney filed the charge on their behalf on August 9 or 10, 2022. The General Counsel issued the complaint on January 31, 2023.

The General Counsel alleges that Respondent violated Section 8(a)(1) of the Act by terminating Christopher Bendel on February 16, 2022, and terminating Gordon Dragoon, Kaleb Noble, and Kestrel Swift on February 18, 2022.

On the entire record, including my observation of the demeanor of the witnesses, and after considering the briefs filed by the General Counsel, Respondent and Charging Parties, I make the following

### FINDINGS OF FACT

#### I. JURISDICTION

Respondent is a software development company located in Colchester, Vermont. It purchases and receives at that facility goods valued in excess of $50,000 directly from points outside of Vermont. Respondent admits, and I find, that it is an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

#### II. ALLEGED UNFAIR LABOR PRACTICES

Respondent, Vermont Information Processing (VIP), is located in Colchester, Vermont. It builds software and manages data for the beverage industry. Its customers include Anheuser-Busch, Molson, Coors, Heineken and Bacardi. VIP is 100

percent owned by its employees through an Employee Stock Option Plan (ESOP).

VIP hired Christopher Bendel in June 2018. At the time of his termination on February 16, 2022, Bendel was a senior software engineer III.[1] There is no credible evidence that Respondent had any plans to terminate Bendel before he circulated a spreadsheet on February 16, 2022. To the extent Respondent's evidence suggests otherwise, I discredit it.

Kaleb Noble and Kestrel Swift were hired by VIP on June 1, 2015. As of his termination Noble was a software engineer II. He had been seeking a salary increase and a promotion to level III (Tr. 134). Noble discussed his desire for a promotion with his Supervisor Sam Graefe several months prior to February 2022.

Swift and Gordon Dragoon were team leaders, software engineer III. VIP hired Dragoon in 2016. There is no credible evidence that Respondent planned to terminate any of the three before becoming aware on February 17, 2022, of an instant messaging chat in which they participated. To the extent Respondent's evidence suggests otherwise, I discredit it.

None of the four employees had been disciplined by VIP during their employment prior to February 16. All four had received salary increases and favorable performance reviews. VIP contends the four discriminatees (or at least Swift and Dragoon) were statutory supervisors excluded from the Act's protections. It bases this claim on the fact that several of them had input in hiring decisions. While they sat in on interviews and provided an assessment of an applicant's technical abilities, they did not make final hiring decisions, nor was their approval of a candidate determinative in the decision whether or not to hire (Tr. 259–260, 271–272, 347).

There is also no evidence that any of the discriminatees played any role in determining which applicants made it to the interview stage of the hiring process. Moreover, after the interview in which they participated, the applicant talked to a hiring manager. Thus, it is clear that the opinion of the discriminatees that an applicant was technically qualified did not necessarily result in the applicant being hired.

The two team leads, Dragoon and Swift, at times determined what specific task a member of their team would perform. There is no evidence that they had any role in determining which employees would be on which team or the general responsibilities of their team members. None of the alleged discriminatees played any role in Respondent's February 2022 plan to restructure its teams. There is no evidence that any of them were consulted about the restructuring plan beforehand.

In mid-February 2022, VIP was preparing to embark on a reorganization of its product teams. The four alleged discriminatees, particularly Bendel, were unhappy with the plan. Bendel was not going to be assigned to a specific product team but was to be on a team that would provide service to the product teams.

### The Spreadsheet

On February 15, 2002, Bendel met virtually with Sam Graefe, his immediate supervisor. He questioned Graefe about his role after the reorganization. Bendel was not satisfied with the responses he received. He may have hung up on Graefe (R. Exh. 11, p. 3).[2] Bendel then called Chris McGinty, VIP's Director of Development. He was also dissatisfied with the responses he received from McGinty as to his future role and whether it would come with a salary increase.

Bendel then talked with Kaleb Noble. Noble told Bendel that he was due to be promoted to software engineer III and asked Bendel about his salary. Bendel told Noble he was making $95,000 a year ($500 more than he was actually making) (GC Exh. 5). Noble responded that he was making $86,000 a year. Bendel then suggested starting a spreadsheet. Noble then prepared the spreadsheet.

In the chat, Noble stated: "The idea in my mind is so if you wanna ask for a raise you got some reference to see if you're getting fisted lol."

Noble and Bendel created a spreadsheet which was accompanied by a Google form for employees to enter into the spreadsheet their name (although they were able to remain anonymous), their department, their position and annual salary (GC Exh. 3). The spreadsheet also contained a section in which to analyze the data. Noble and Bendel then sent the spreadsheet to Kestrel Swift and Gordon Dragoon, who disseminated it to other employees. At some point someone included a note at the bottom of the sheet indicating that 100 percent of the developers were underpaid. The four discriminatees were the first four names entered on the spreadsheet.

On the morning of February 16, Bendel, Noble, Swift and Dragoon participated in a Group Chat about the spreadsheet.[3] The four employees were using their VIP computers and were connected to the VIP server. This chat occurred while Chris McGinty was conducting a group chat about the VIP reorganization. The four disparaged the VIP reorganization plan (R. Exh. 14).

A number of employees entered their data, including salaries into the spreadsheet. At about 11 a.m., Louise Morgan, VIP's Director of Operations accessed the chat and saw the spreadsheet. Morgan was apparently told about the spreadsheet by supervisor Chris Morse. Morse was concerned that some of the data was inaccurate and the conclusion at the bottom of the spreadsheet that 100 percent of VIP programmers were underpaid (Tr. 317).[4] When Morse and Morgan talked to VIP Director of Development Chris McGinty they determined that Chris Bendel had created the spreadsheet and was the author of the 100-percent underpaid calculation. That was a major factor in

---

[1] Software engineer III is a higher classification than software engineer II and generally comes with a higher salary.

[2] While Bendel wrote in a chat that he had hung up on Graefe, at trial he testified, that he was "puffing my chest a little bit in the chat with my friends, Tr. 95. Graefe did not testify so it is unclear whether Bendel hung up on him. However, it is clear that the conversation ended abruptly. Whether or not Bendel hung up on Graefe, there is no credible evidence that Respondent relied on this in terminating him. Graefe in his account of the conversation to Chris McGinty did not claim that Bendel hung up on him (R. Exh. 5 pp. 3–4).

[3] The time indicated for the various entries are the time in the Greenwich (London) time zone. The chat took place starting at about 8:17 East Coast time.

[4] Neither Morse nor Morgan testified in this proceeding. It may have been McGinty, rather than Morse, who zeroed in on the 100 percent calculation (Tr. 471).

Respondent's decision to terminate Bendel (Tr. 380–381, 472). In this regard, John Simard, VIP's Chief Financial Officer, who effectively made the decision to terminate Bendel, testified:

> The problem was Chris was carrying a narrative and he was manipulating the worksheet to make that message to everybody that programmers are all underpaid, a hundred percent of them.
> And that's unacceptable.

(Tr. 497. Also see, Tr. 519–520.)

Either McGinty or Simard directed IT Manager Jeff Compo to investigate how the spreadsheet was disseminated and whether it was communicated outside of VIP.

Soon afterwards VIP disabled Bendel's work account and took down the spreadsheet. At about noon Chris McGinty called Bendel and told him that he was being terminated for his poor attitude in the past. McGinty gave Bendel no other reason for his termination.[5]

After that Kaleb Noble invited Bendel to join an instant messaging chat on a platform called Slack (R. Exh. 14). Besides Noble and Bendel, Swift, Dragoon, and a former VIP employee Colby Arcemont participated.

Among the relevant comments were:

> Bendel: I really do hope we can all leave within the next month or two.

Bendel and Swift discussed a fellow employee named Feng, who they considered underpaid. Bendel states: "let's make a pact that we bring him along wherever one of us ends up."

Swift wrote "I told him all of us were already on the verge of quitting, so he should join us."

Swift also wrote: Can't wait for every SE2 to be making more than me as a Team Lead.

Dragoon wrote: What's fucked is our salaries compared to other companies.

Dragoon and Bendel disparaged the salary increase Dragoon had just received.

Swift disparaged the VIP HR director "Since C is garbage."
Swift wrote:

> Morse (his immediate supervisor) says he's making my case to McGinty every time he talks to him.
> But apparently McGinty can't get more money from Simard (VIP's CFO)
> Because he doesn't believe developers deserve money.

> Bendel: Wanna unionize.
> Dragoon: I would support how I can. But I'm trying to get out.
> Swift: DON'T HIRE PEOPLE WITH EXPERIENCE
> Bendel: the VIP way
> Dragoon: Their entire plan is to hope for a recession and hope VIP is the only option in town
> Swift: We'll make a union out of us yet.

At about 10:50 a.m. Bendel wrote: "Louise has entered the game."[6]

About a half hour later, Swift, Dragoon and Noble noticed that Bendel was locked out and learned that he had been fired. After Bendel was terminated the discussion continued on a different chat platform named Slack.

The next entries are critical in that Respondent relies on them heavily in justifying terminating Swift, Dragoon and Noble (R. Exh. 14 pp. 39–41.)

> Dragoon: He [Bendel] was actually fired
> Swift: What the fuck?
> Swift: Well, that is extremely illegal
> Swift: As linked in this spreadsheet.
> Noble: If I drop you know what happened.
> Dragoon: I think I need to follow up with Sam here.
> Noble: His computer has been remotely locked.
> Swift: Jesus fucking Christ
> Dragoon: he might get a decent payout here.
> Noble: Purge your computers boys

The chat then indicates that Noble tried to delete the "purge your computers" comment. At trial he testified that the Slack platform will not erase the original. This line, he testified, reflects when he attempted to edit his message or delete a duplicate message (Tr. 166–168.)

> Noble: Assume all chats are public.
> Swift: Especially these ones. They get inherited by your manager.
> Dragoon: Eh we haven't said anything terrible.
> Dragoon: Maybe somewhat rude.
> Swift: Yeah, I don't care. If I'm already fired, what are they going to do?
> Dragoon: I am still shocked.
> Dragoon: Also appalled.
> Dragoon: I knew that upper management were snakes.
> Dragoon: But this is a new low.
> Noble: The doc is down.
> Kestrel: Fuck.
> Swift: Did anyone download it.
> Dragoon: Yep.

The next day, Kestrel Swift threatened to resign on account of the termination of Chris Bendel. Both Chris Morse and Chris McGinty were aware of this (R. Exh. 40, par. 30). Dragoon and

---

[5] Respondent contends, based on a comment made by Bendel in a chat (GC Exh. 17, p. 4), that it had plans to terminate Bendel prior to its discovery of the spreadsheet. However, there is no credible evidence that VIP decided to terminate Bendel prior to discovering the spreadsheet. (R. Exh. 5) and McGinty's testimony at Tr. 307–310 establish the opposite.

[6] Louise Morgan, VIP's director of operations, accessed the spreadsheet at this time.

Noble told their supervisor Sam Graefe how unhappy they were about Bendel's termination and tried to defend him (Tr. 240–241).

On February 17, while investigating employee communications relating to the spreadsheet, Jeff Compo, IT manager at VIP discovered the chat.

At about 8 a.m. on February 18, 2022, VIP managers, including CEO Dan Byrnes, Louise Morgan, HR Manager Cathy Courier, McGinty, Sam Graefe, and Morse met with CFO John Simard.[7] McGinty read excerpts from the chat and the participants discussed it. The meeting participants also looked at the performance reviews of the discriminatees. CFO Simard was particularly offended by Kestrel Swift's comment on his 2020 review regarding his loyalty to VIP (Tr. 488).

> "Loyalty" is not an "area of improvement." VIP promotes unhealthy practices and it's unhealthier to tacitly accept that by remaining silent. Even if I don't have the power to change anything, the more these things are voiced, the better the chances of someone who matters doing something to actually improve them. VIP will fire me without remorse the second it doesn't think it can squeeze more money out of me that (sic) it pays me. Why should I be loyal? This is a loveless exchange of labor for currency between two mutually selfish parties. If anything, the fact that I voice up problems I see in the company should indicate that I care more about it than I need to. I could sit down, shut up, and ignore all the areas of improvement that I see in the company, but I'm invested enough that I want to see it do better.

(GC Exh. 6.)

CFO Simard pushed hard for the termination of Noble, Swift and Dragoon. McGinty and possibly Morse and/or Graefe pushed for less severe punishment for the 2 team leads, Swift and Dragoon (Tr. 484–488). Simard thought McGinty advocated retaining Kaleb Noble, the author of the "purge your computers" comment. McGinty's affidavit (R. Exh. 40, par. 44), is consistent with Simard's recollection.

McGinty, in particular, was concerned that terminating the twoteam leads, Swift and Dragoon (and/or Noble), were the only VIP employees with a working knowledge of a couple of VIP's applications (Tr. 487). In the end, CEO Byrnes deferred to Simard and authorized him to terminate Swift, Noble, and Dragoon.

That the 100-percent calculation was material in this decision is established by the following testimony by Simard:

> So here are people that are functional and happy and love the culture. And that's all lost. They're all at home now. They're all working. They're all isolated. And you now, if you have one or two people poisoning that well and telling them this is a bad place, and they're underpaid, it starts to resonate when you hear it for some. And, you know, that's Chris' role. Chris Bendel.

(Tr. 489.)

On February 18, VIP's CFO John Simard called Kestrel Swift to inform Swift that he had been terminated. Simard told Swift that he was being discharged because he was unhappy at VIP. Swift told Simard he wanted to stay with the company. Simard responded that the things Swift wrote in the February 16 chat were inconsistent with his desire to stay at VIP. Simard gave the same explanation to Gordon Dragoon and Kaleb Noble when informing them that they were being terminated. He gave no other reason (Tr. 500). He did not tell any of the three that he was concerned about the security of VIP's data or systems.[8]

At the time Dragoon was terminated, he was 80 percent vested in the ESOP. In March 2022, he would have been 100 percent vested. Dragoon was planning on finding another job as soon as he was 100percent vested. He may have used another job offer to negotiate a raise at VIP.

The four discriminatees did not purge or delete any material from their computers. Respondent did not investigate whether or not they did so. Compo, the only VIP IT employee who testified, did not. I infer that had anyone else done an investigation, Respondent would have called them as a witness (Tr. 345). No member of management asked Kaleb Noble what he meant or intended when he wrote, "purge your computers" (Tr. 349, 357). Respondent does not have any knowledge that any of the 4 did anything to compromise any information at VIP (Tr. 359).

Analysis

Section 7 provides that, "employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, *and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . .*" (Emphasis added).

In *Myers Industries (Myers 1)*, 268 NLRB 493 (1984), and in *Myers Industries (Myers II)* 281 NLRB 882 (1986), the Board held that "concerted activities" protected by Section 7 are those "engaged in with or on the authority of other employees, and not solely by and on behalf of the employee himself." However, the activities of a single employee in enlisting the support of fellow employees in mutual aid and protection is as much concerted activity as is ordinary group activity.

In order to establish a violation of Section 8(a) (3) and/or (1), the Board generally requires the General Counsel to make an initial showing sufficient to support an inference that the alleged discriminatee's protected conduct was a 'motivating factor' in the employer's decision. Then the burden shifts to the employer to demonstrate that the same action would have taken place even in the absence of protected conduct, *Wright Line,* 251 NLRB 1083 (1980), enfd. 662 F.2d 889 (1st Cir. 1981), cert. denied 455 U.S. 989 (1982), approved in *NLRB v. Transportation Management Corp.,* 462 U.S. 393, 399–403 (1983); *American Gardens Management Co.*, 338 NLRB 644 (2002); *General Motors,* 369 NLRB No. 127 (2020).

In this case there is no question that the General Counsel met

---

[7] McGinty and Simard testified in this proceeding. The other attendees did not.

[8] Similarly, Engineer Manager Michael Couillard, in explaining to his subordinates why the four discriminatees were terminated, did not mention any concern about sabotage (R. Exh. 22). His recap of an all-hands meeting on February 18, indicates that neither Chris McGinty or Dan Byrnes mentioned such concerns to VIP employees.

its initial burden of showing that all four discriminatees engaged in concerted activity, that Respondent VIP was aware of that activity, bore animus towards it and terminated the 4 due to their concerted activity. The almost immediate taking down of the spreadsheet by itself establishes Respondent's animus towards the employees involved in disseminating it.[9]

The timing of the terminations and the lack of any credible evidence that Respondent planned to discharge any of the 4 prior to February 16, 2022, supports the inference of discriminatory discharge, *Case Farms of North Carolina,* 353 NLRB 257, 260–261 (2008). Respondent's reliance on the lack of discipline for others who entered data on the spreadsheet (R. Br. at 6), is misplaced. A discriminatory motive, otherwise established, is not disproved by an employer's proof that it did not retaliate against all those involved in the protected activity, *Nachman Corp. v. NLRB,* 337 F.2d 421, 424 (7th Cir. 1964); *McKee Electric Co.,* 349 NLRB 463, 464–465 fn. 9 (2007). Similarly, the discriminatees' motives for engaging in protected activity is irrelevant, *ABS Co.,* 269 NLRB 774, 774–775 (1984).

Section 7 protects concerted activity which in its inception involves only a speaker and a listener. Such activity is an indispensable preliminary to self-organization or other group action, *Whittaker Corp.,* 289 NLRB 933 (1988); *Mushroom Transportation Co. v. NLRB,* 330 NLRB 683, 685 (3d Cir. 1964). The creation and dissemination of the spreadsheet herein was clearly concerted and protected in that it was an indispensable step towards pressing VIP on wage transparency and/or consistency.

Assisting other employees affected by the employer's action or inaction falls within the Act's "mutual aid and protection" clause of Section 7, even if the assisting employee is not personally affected, *American Medical Response of the Mid-Atlantic,* 369 No. 125 (2020); *Richboro Community Mental Health Council,* 242 NLRB 1267, 1267–1268 (1979); *Delta Health Center,* 310 NLRB 26, 43 (1993); *Butler Medical Transport, LLC,* 365 NLRB 1095 (2017).

Chris Bendel in creating the spreadsheet was assisting Kaleb Noble in his quest for a comparable salary to Bendel's if he was promoted. This is protected activity. Respondent was aware that it was concerted via an admitted agent, Chris Morse, who had discussed Noble's desire for a raise and a promotion with Noble[10]. Louise Morgan, when viewing the spreadsheet, was aware that it was a group effort pertaining to employees' compensation.

The General Counsel has not established that VIP has a policy prohibiting employees from sharing salaries. That, however, is beside the point. The complaint alleges that VIP terminated the four employees for creating and disseminating the spreadsheet.[11] VIP terminated Bendel for that very reason. He created and disseminated the spreadsheet in concert with Kaleb Noble.

The only question in the case is whether creating and disseminating the spreadsheet and the ensuing chat was protected by Section 7 and/or whether the four discriminatees otherwise forfeited the protections of the Act. Respondent appears to contend that they forfeited Section 7 protection because they were disgruntled and job-hunting. There is no support for such a proposition in Board law.

VIP terminated Noble, Swift and Dragoon for their instant messaging chats about the spreadsheet and Bendel's termination.[12] The reason for their terminations is inextricably linked to their roles in creating and disseminating the spreadsheet. Even if the complaint is deemed not to include the reasons for the Swift, Noble, and Dragoon discharges, the Board may find a violation in the absence of a specified allegation in the complaint if the issue is closely connected to the subject matter of the complaint and has been fully litigated. This rule has been applied with particular force where the finding of a violation is established by the testimonial admissions of the Respondent's witnesses, *Pergament United Sales,* 296 NLRB 333, 334 (1989), enfd. 920 F.2d. 130 (2d Cir. 1990).

I also find Respondent's reliance on Kaleb Noble's "purge your computers" to be pretextual. First of all, assuming that would be a basis for terminating Noble, Respondent has not explained how that would be a basis for terminating Dragoon and Swift. Assuming that "purge your computers" was unprotected, neither Dragoon nor Swift would have lost the protection of the Act merely by participating in an otherwise protected discussion in which other persons made unprotected statements, *Triple Play Sports Bar & Grill,* 361 NLRB 308, 312 (2014), enfd. 629 Fed.Appx. 33 (2d Cir. 2015).

That several managers opposed terminating several of the discriminatees establishes that fear of sabotage was not a real concern. Another indicium that this was pretextual is paragraph 44 of Chris McGinty's affidavit, which indicates that VIP was most hesitant to terminate Noble, the author of the "purge your computers" comment (R. Exh. 40).

More importantly, Noble's comment is open to many interpretations, the most logical is that he was afraid of management

---

[9] In addition to dissemination of the spreadsheet and ensuing chat discussion, the February 17, 2022, protests of Kestrel Swift about the Bendel termination to Chris Morse and Noble and Dragoon's protests to Sam Graefe are also protected activity. Respondent's brief at p. 41 establishes that the "displeasure" of all three discriminatees with Bendel's termination was a factor that VIP considered in terminating them.

[10] Swift wrote in his chat: "Morse [his immediate supervisor] says he's making my case to McGinty every time he talks to him." This is not hearsay pursuant to Federal Rule of Evidence 801(d)(2). Swift's assertion was not contradicted by Respondent. Morse's title is manager of applications (GC Exh. 9).

[11] Moreover, an employer could well have no objection to two or three employees sharing salary information but still have animus to a concerted effort to have many employees share their salaries.

[12] I do not put much or any weight on the June 2017 email from Manager Derek Punt to employee Justin Martin instructing Martin not to share payroll information with your peers. (R. Exh. 39.) It doesn't establish that Punt was acting pursuant to a VIP policy. On the other hand, it does establish that if VIP had a policy affirmatively allowing employees to share salary information, its managers and supervisors were not uniformly aware of it.

Although not fully developed by the parties, there is some question in my mind as to whether Respondent's review of the Slack Chat violated the Act. Respondent's brief at pp. 26–27 suggests the timing of Ms. Safar's litigation hold letter (R. Exh. 37 and Jeff Compo's perusal of the Charging Parties' chats was coincidental). I was under the impression that Respondent justified its investigation into the chats on the basis of the hold letter (R. Exh. 9. Tr. 440–444, 477–480). If the review of the chat constitutes surveillance of employees' protected activities, Respondent may not be entitled to rely on the contents of the chat in disciplining them, *Kidde Inc.,* 294 NLRB 840, 840 fn. 3 (1989).

seeing the three programmers' comments disparaging VIP and its management. VIP made no effort to ask Noble what he meant. In any event, if genuinely concerned with sabotage, VIP's concerns could have been met by threatening to sue and possibly criminally prosecute the three if they sabotaged VIP's systems. Respondent's failure to give Noble, Dragoon, and Swift the opportunity to explain their alleged misconduct is evidence of pretext, *Lucky Cab,* 360 NLRB 271, 274 fn. 13 (2014).

Respondent has not met its burden that it would have terminated any of the 4 absent their protected activity. I discredit Respondent's testimony that other employees would believe the spreadsheet was an official VIP document or that employees would be coerced into completing it. I would note that Respondent introduced no rank-and-file employee testimony to support this assertion. A VIP employee would not likely think that VIP was asking them to fill out a spreadsheet asking for information that the company already possessed.

Among the reasons advanced for terminating Bendel, VIP contends that his spreadsheet was inaccurate. It has not established that it was materially inaccurate.[13] Bendel and others may have rounded up or down when they entered their salary. Moreover, the accuracy of the spreadsheet is immaterial to the test of its protected character, unless inaccurate statements are made with knowledge of their falsity or with reckless disregard for their truth or falsity. The mere fact that statements or representations are false, misleading or inaccurate is insufficient to demonstrate that they are maliciously untrue, *Desert Cab, Inc. d/b/a ODS Chauffeured Transp.* 367 NLRB No. 87 (2019); *MasTec Advanced Technologies,* 357 NLRB 103 (2011); *Sprint/United Management Co.,* 339 NLRB 1012, 1018 (2003); *Valley Hospital Medical Center,* 351 NLRB 1230, 1252–1253 (2007).

*Supervisory Status*

Section 2(3) of the Act excludes supervisors, as defined in Section 2(11) from the definition of an employee who has rights under Section 7 of the Act. Section 2(11) defines a "supervisor" as a person who has the authority in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward , or discipline other employees, or responsibly to direct them, to adjust their grievances, or effectively to recommend such action , if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgement.

Since Respondent claims that Dragoon and Swift are supervisors, it is its burden to prove that they were supervisors and thus not protected by the Act, *Smithfield Packing Co.,* 344 NLRB 1.(2004). It has not done so. The authority of team leads Swift and Dragoon to give members of their team assignments was routine and has not been shown to require the kind of independent judgment to make them supervisors, *Croft Metals, Inc.,* 348 NLRB 717, 718, 721–722 (2006); *Oakwood Healthcare,* 348 NLRB 686 (2006)

The authority to 'assign' refers to 'the act of designating an employee to a place (such as a location, department, or wing), appointing an employee to a time (such as a shift or overtime period), or giving significant over all duties, i.e., tasks, to an employee. In sum, to 'assign' for purposes of Section 2(11) refers to the designation of significant overall duties to an employee, not to the ad hoc instruction that the employee perform a discrete task."

(348 NLRB at 721.)

Neither Swift nor Dragoon had the authority to hire, or to effectively recommend the hiring of a job applicant. As with every supervisory indicium, hiring or recommending hiring must be done with independent judgment before it is to be considered supervisory under Section 2(11). The record herein shows that Swift and Dragoon recommended hiring solely with respect to whether the applicant was capable of doing the job. This is insufficient to establish that Dragoon and Swift were statutory supervisors. There is no evidence that Swift or Dragoon were called upon to make a comparative assessment of different applicants' skills. They merely opined as to whether the applicant was capable of doing the job for which they applied, a routine task. The final hiring decision was not theirs and Swift's recommendation was, at least on one occasion, ignored.

As to the assignment indicia, Respondent has not established either Dragoon or Swift had the authority to do anything more than instruct another employee to do a discrete task.

REMEDY

The Respondent, having illegally discharged Chris Bendel, Kestrel Swift, Kaleb Noble, and Gordon Dragoon must offer them reinstatement and make them whole for any loss of earnings and other benefits. Backpay shall be computed in accordance with *F. W. Woolworth Co.*, 90 NLRB 289 (1950), with interest at the rate prescribed in *New Horizons*, 283 NLRB 1173 (1987), compounded daily as prescribed in *Kentucky River Medical Center,* 356 NLRB 6 (2010). Respondent shall compensate them for their search-for-work and interim employment expenses regardless of whether those expenses exceed their interim earnings, computed as described above.

Respondent shall file a report with the Regional Director for Region 3 allocating backpay to the appropriate calendar quarters. Respondent shall also compensate Chris Bendel, Kestrel Swift, Kaleb Noble, and Gordon Dragoon for the adverse tax consequences, if any, of receiving one or more lump-sum backpay awards covering periods longer than 1 year, *AdvoServ of New Jersey,* 363 NLRB 1324 (2016). Also, within 21 days of the date the amount of backpay is fixed either by agreement or Board order, or such additional time as the Regional Director may allow for good cause shown, file with the Regional Director for Region 3, a copy of the corresponding W-2 forms for Chris Bendel, Kestrel Swift, Kaleb Noble, and Gordon Dragoon reflecting the backpay awards.

Also, Respondent must compensate Chris Bendel, Kestrel Swift, Kaleb Noble, and Gordon Dragoon for all direct or foreseeable pecuniary harms that they suffered as a result of

---

[13] I consider that "100% underpaid" is a statement of opinion, not an inaccurate statement of fact. The other "errors" appear to consist of employees slightly approximating their salaries.

Respondent's unfair labor practices, regardless of whether these expenses exceed interim earnings, *Thryv, Inc.,* 372 NLRB No. 22 (2022). This shall be calculated separately from taxable backpay with the rate of interest prescribed in *New Horizons*, 283 NLRB 1173 (1987), compounded daily as prescribed in *Kentucky River Medical Center,* 356 NLRB 6 (2010), *Crushin' It LLC,* 372 NLRB 100 (2023).

On these findings of fact and conclusions of law and on the entire record, I issue the following recommended[14]

ORDER

The Respondent, Vermont Information Processing, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Discharging, suspending or otherwise discriminating against any employee for engaging in protected concerted activity.

(b) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Within 14 days from the date of the Board's Order, offer Chris Bendel, Kestrel Swift, Kaleb Noble, and Gordon Dragoon full reinstatement to their former jobs or, if those jobs no longer exist, to substantially equivalent positions, without prejudice to their seniority or any other rights or privileges previously enjoyed.

(b) Make Chris Bendel, Kestrel Swift, Kaleb Noble, and Gordon Dragoon whole for any loss of earnings and other benefits suffered as a result of the discrimination against them in the manner set forth in the remedy section of the decision.

(c) Compensate Chris Bendel, Kestrel Swift, Kaleb Noble, and Gordon Dragoon for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and file with the Regional Director for Region 3, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay award to the appropriate calendar years.

(d) Compensate Chris Bendel, Kestrel Swift, Kaleb Noble, and Gordon Dragoon for their search-for-work and interim employment expenses regardless of whether those expenses exceed their interim earnings.

(e) Compensate Chris Bendel, Kestrel Swift, Kaleb Noble, and Gordon Dragoon for all direct or foreseeable pecuniary harms that they suffered as a result of Respondent's unfair labor practices, regardless of whether these expenses exceed interim earnings.

(f) File with the Regional Director for Region 3 a copy of the corresponding W-2 forms for Chris Bendel, Kestrel Swift, Kaleb Noble, and Gordon Dragoon reflecting the backpay awards as set forth in the remedy section of this decision.

(g) Within 14 days from the date of the Board's Order, remove from its files any reference to the unlawful discharges and within 3 days thereafter notify Chris Bendel, Kestrel Swift, Kaleb Noble, and Gordon Dragoon in writing that this has been done and that their discharges will not be used against them in any way.

(h) Preserve and, within 14 days of a request, or such additional time as the Regional Director may allow for good cause shown, provide at a reasonable place designated by the Board or its agents, all payroll records, social security payment records, timecards, personnel records and reports, and all other records, including an electronic copy of such records if stored in electronic form, necessary to analyze the amount of backpay due under the terms of this Order.

(i) Within 14 days after service by the Region, post at its Colchester, Vermont facility copies of the attached notice marked "Appendix.[15] Copies of the notice, on forms provided by the Regional Director for Region 3, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, the notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material. In the event that, during the pendency of these proceedings, the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since February 16, 2022.

(j) Within 21 days after service by the Region, file with the Regional Director a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

Dated, Washington, D.C. July 31, 2023

APPENDIX

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union.
Choose representatives to bargain with us on your behalf.
Act together with other employees for your benefit and protection.

---

[14] If no exceptions are filed as provided by Sec. 102.46 of the Board's Rules and Regulations, the findings, conclusions, and recommended Order shall, as provided in Sec. 102.48 of the Rules, be adopted by the Board and all objections to them shall be deemed waived for all purposes.

[15] If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

　　　　Choose not to engage in any of these protected activities.

WE WILL NOT discharge, suspend or otherwise discriminate against any of you for engaging in protected concerted activity.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the

exercise of the rights guaranteed you by Section 7 of the Act.

WE WILL, within 14 days from the date of this Order, offer Chris Bendel, Kestrel Swift, Kaleb Noble, and Gordon Dragoon full reinstatement to their former jobs or, if those jobs no longer exist, to a substantially equivalent position, without prejudice to their seniority or any other rights or privileges previously enjoyed.

WE WILL make Chris Bendel, Kestrel Swift, Kaleb Noble, and Gordon Dragoon whole for any loss of earnings and other benefits resulting from their discharge, less any net interim earnings, plus interest compounded daily.

WE WILL compensate Chris Bendel, Kestrel Swift, Kaleb Noble, and Gordon Dragoon for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and WE WILL file a report with the Regional Director for Region 3 allocating the backpay award to the appropriate calendar quarters.

WE WILL compensate Chris Bendel, Kestrel Swift, Kaleb Noble, and Gordon Dragoon for their search-for-work and interim employment expenses regardless of whether those expenses exceed their interim earnings.

WE WILL compensate Chris Bendel, Kestrel Swift, Kaleb Noble, and Gordon Dragoon for all direct or foreseeable pecuniary harms that they suffered as a result of our unfair labor practices, regardless of whether these expenses exceed interim earnings.

WE WILL, within 14 days from the date of this Order, remove from our files any reference to the unlawful discharges of Chris Bendel, Kestrel Swift, Kaleb Noble, and Gordon Dragoon and WE WILL, within 3 days thereafter, notify them in writing that this has been done and that the discharges will not be used against them in any way.

WE WILL file with the Regional Director for Region 3, within 21 days of the date the amount of backpay is fixed by agreement or Board order or such additional time as the Regional Director may allow for good cause shown, a copy of the corresponding W-2 form(s) for Chris Bendel, Kestrel Swift, Kaleb Noble, and Gordon Dragoon reflecting the backpay award.

VERMONT INFORMATION PROCESSING, INC

The Administrative Law Judge's decision can be found at www.nlrb.gov/case/03-CA-301055 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940.



IN THE UNITED STATES COURTS OF APPEALS
FOR THE
DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| VERMONT INFORMATION PROCESSING, INC. | ) ) | |
| *Petitioner*, | ) ) | |
| v. | ) ) | NO. _____ |
| NATIONAL LABOR RELATIONS BOARD, | ) ) ) | |
| *Respondent.* | ) | |

# **CERTIFICATE OF SERVICE**

I hereby certify that on November 19, 2024, I electronically filed the following documents via the CM/ECF system for the United States Court of Appeals for the District of Columbia:

- *Petition for Review*

- *Rule 26.1 Corporate Disclosure*

Copies of the foregoing documents were served via mail on the following:

Abigail Snelling, Esq.
Honors Attorney – Region 3
National Labor Relations Board
130 S Elmwood Avenue
Buffalo, NY 14202
Abigail.Snelling@nlrb.gov

Desmond D. Metzger, Esq.
Field Attorney
National Labor Relations Board – Region 3
Niagara Center Bldg., Suite 630
130 S Elmwood Avenue
Buffalo, NY 14202
Desmond.Metzger@nlrb.gov

Claudine C. Safar, Esq.
Carly E. Rippel, Esq.
Monaghan Safar PLLC
27 Main Street
Burlington, VT  05401
csafar@msvtlaw.com
cerippel@msvtlaw.com

DATED at Washington, District of Columbia, this 19th day of November, 2024.

        VERMONT INFORMATION PROCESSING, INC.

        BY:  STRIS & MAHER LLP

        By:_____*/s/Tillman Breckenridge*_____
           Tillman J. Breckenridge, Esq.
           1717 K Street NW, Suite 900
           Washington, DC  20005
           T:  (202) 800-6030
           E:  tbreckenridge@stris.com

10311111_1:03923-00024