# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued October 15, 2025        Decided May 26, 2026

No. 24-1360

VERMONT INFORMATION PROCESSING, INC.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

CHRISTOPHER BENDEL, ET AL.,
INTERVENORS

————

Consolidated with 24-1375

————

On Petition for Review and Cross-Application
for Enforcement of an Order
of the National Labor Relations Board

————

*Stephen D. Ellis* argued the cause for petitioner. With him on the briefs was *Carl "Ott" Lindstrom*. *Tillman J. Breckenridge* entered an appearance.

2

*Gregoire Sauter*, Attorney, National Labor Relations Board, argued the cause for respondent.  With him on the brief were *Ruth E. Burdick*, Deputy Associate General Counsel, *Meredith Jason*, Assistant General Counsel, and *Usha Dheenan*, Supervisory Attorney.

Before: MILLETT, WALKER and PAN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PAN.

Opinion concurring in part and dissenting in part filed by *Circuit Judge* WALKER.

PAN, *Circuit Judge*:  Employees often wonder how much money their coworkers are making.  Such information might help them negotiate salary raises, serve as a point of comparison when seeking other employment, or simply satisfy their curiosity.  Sharing salary information among employees is a protected activity under the National Labor Relations Act.  In this case, the National Labor Relations Board (NLRB) determined that Vermont Information Processing, Inc. (VIP) illegally fired four employees for creating and disseminating a salary-sharing spreadsheet.  The Board ordered VIP to offer the employees reinstatement and to compensate them financially.  VIP petitions for review of that order, while the NLRB cross-applies for enforcement.

We hold that substantial evidence supports the Board's determination that VIP illegally fired one of the employees, Christopher Bendel.  But with respect to the other three workers, the Board impermissibly broadened its theory of liability to include an additional consideration beyond the scope of the NLRB General Counsel's complaint against the company.  We therefore grant each petition in part, deny each petition in part, and remand for further proceedings.

3

## I. Factual Background

VIP is a software company that services the beverage industry. It employs software engineers to build and maintain applications used by its customers, and it organizes those engineers into small software-development teams.

In February 2022, VIP began rolling out a restructuring plan. As part of the roll-out, software engineer Christopher Bendel met with his supervisor, Sam Graefe, to discuss how the restructuring would affect Bendel's role. The meeting did not go well. Bendel was dissatisfied with the new position that management had designed for him and expressed his concerns to Graefe. He ended the conversation abruptly and then called Graefe's supervisor, Director of Development Christopher McGinty, to discuss his concerns. Prior to those conversations, Bendel had informed both Graefe and McGinty that "he had offers from other companies." J.A. 851. When Graefe and McGinty compared notes about their interactions with Bendel, Graefe noted that Bendel "didn't seem too happy about our conversation," while McGinty wrote that it "wasn't a pretty conversation." S.J.A. 4–6.

Later that day, Bendel messaged another software engineer, Kaleb Noble, on VIP's Google Workspace platform. Bendel described his meeting with Graefe as a "shitshow" and claimed that he had "hung up on [Graefe]."[1]  J.A. 1137–39. During that conversation, Noble asked Bendel, "Do you mind me asking your salary . . . ?" J.A. 1141. Bendel informed Noble that his salary was $95,000, and Noble responded that his was $87,000. Bendel then asked, "[W]anna start a [salary]

---

[1]    Graefe has never confirmed that Bendel hung up on him, and Bendel later testified that he had been "puffing [his] chest a little bit in the chat with" Noble. J.A. 594.

4

spreadsheet?" *Id.* After Noble agreed, Bendel created a spreadsheet and shared it with Noble, and Noble said that he would share it with two other software engineers, Gordon Dragoon and Kestrel Swift. Noble described the spreadsheet's purpose as follows: "The idea in my mind is so if you wanna ask for a raise you got some reference to see if you're getting fisted lol." J.A. 1145. Bendel agreed. Bendel and Noble shared the spreadsheet with Dragoon and Swift, and all four employees entered their names, positions, and salaries into the first four rows.

The next day, between 8:00 and 9:00 a.m., VIP held a virtual all-hands meeting to launch its restructuring plan. During or immediately after the meeting, the four employees began sharing the spreadsheet link with other employees. Around twenty-five coworkers entered information into the spreadsheet. An employee who received the spreadsheet shared it with a supervisor, who shared it with Development Director McGinty, who passed it on to Operations Director Louise Morgan.

At 11:26 a.m., Morgan met with McGinty to view and discuss the spreadsheet. From the file-ownership information, they could tell that Bendel had created it. And they noticed a notation on the spreadsheet indicating that "100 [percent]" of VIP's software developers were "underpaid." J.A. 1293 (showing two adjacent spreadsheet cells, the first reading "% of underpaid devs" and the next reading "100"). Morgan and McGinty attributed that statement to Bendel, as the spreadsheet's creator.[2] When they told Chief Financial Officer

---

[2] The record contains mixed evidence concerning whether Bendel actually added this notation, or whether a different employee did. But the record makes clear that, beyond identifying who originally

5

John Simard and other company leaders about the spreadsheet, Simard reacted strongly. Simard believed that the spreadsheet was "not appropriate," "not accurate," and "serve[d] no purpose." J.A. 1028. In particular, he took issue with "the idea that [the spreadsheet] was being used to demonstrate that all of [VIP's] programmers, a hundred percent of them[,] are underpaid." *Id.* Based largely on Simard's arguments, management decided to disable the spreadsheet. They then discussed Bendel's future at the company and quickly decided to fire him.

At around 11:32 a.m., VIP management disabled Bendel's internal accounts. The company remotely locked his computer and fired him at around noon. When informing Bendel of his termination, McGinty cited Bendel's "feeling towards VIP" and his "attitude," particularly "towards the restructuring and how he . . . was uninterested in partaking in that." J.A. 855; *accord* J.A. 1130 (Bendel's description of his conversation with McGinty). Management disabled the spreadsheet at around 12:19 p.m., but Dragoon informed Noble and Swift that he had already downloaded the spreadsheet and would transfer it to his personal email.

During and after these events, the four creators of the spreadsheet exchanged a plethora of colorful messages. Many of those messages pertained directly to the spreadsheet, their salaries, and their unhappiness with Bendel's firing. Other messages went further afield. For example, the employees discussed their desire to leave VIP and to convince one of their coworkers to join them. They repeatedly used profanity to criticize VIP management; discussed "[p]urg[ing] [their] computers," J.A. 1197; and talked about sharing their

---

created the spreadsheet, Morgan and McGinty made no further effort to verify that Bendel authored the notation.

6

complaints with a former VIP employee who was working for a VIP customer.

The day after Bendel's termination, VIP's Information Technology Director discovered the messages and forwarded them to management, prompting management to convene a meeting to discuss the messages and the fate of their authors. Senior executives reviewed the spreadsheet, the messages, and the employees' most recent performance evaluations. It came to light that in a performance review from two years earlier, Swift had stated, "VIP will fire me without remorse the second it doesn't think it can squeeze more money out of me tha[n] it pays me. Why would I be loyal? This is a loveless exchange of labor for currency between two mutually selfish parties." J.A. 1366. Simard, concerned by the messages and by Swift's statement, successfully advocated for firing the disgruntled employees. VIP terminated Dragoon, Noble, and Swift later that day. The company did not conduct any further investigation into the fired employees' conduct.

Immediately after the terminations, McGinty held a meeting with all VIP employees. He announced that VIP had terminated the four spreadsheet creators but emphasized that employees remained free to share salary information.

## II. Procedural Background

Bendel, Dragoon, Noble, and Swift filed an NLRB charge against VIP, accusing the company of firing them for "salary sharing efforts." J.A. 1254. The NLRB General Counsel then filed a complaint and notice of hearing against VIP for violating the National Labor Relations Act (NLRA). The complaint alleged that VIP had fired the four employees for "engag[ing] in concerted activities with each other and with other employees for the purposes of mutual aid and protection,

7

by creating and disseminating a spreadsheet where employees could view and share salary information." J.A. 1258.

The case was tried before an administrative law judge (ALJ). Numerous witnesses testified, including the four employees and several members of VIP's management team. The ALJ ruled against VIP. He concluded that VIP had terminated Bendel "for creating and disseminating the spreadsheet." J.A. 1739. And he determined that VIP had terminated Dragoon, Noble, and Swift "for their instant messaging chats about the spreadsheet and Bendel's termination," activities "inextricably linked to their roles in creating and disseminating the spreadsheet." *Id.* He found as a factual matter that the spreadsheet was not "materially inaccurate" and that the "100% underpaid" notation was "a statement of opinion, not an inaccurate statement of fact." J.A. 1740 & n.13. As to remedies, the ALJ ordered VIP to offer reinstatement to the four terminated employees and to compensate them financially for certain monetary losses caused by their wrongful terminations.

VIP timely filed exceptions to the ALJ's decision. Regarding Bendel, it argued that it had permissibly fired him for using VIP's resources "to create and disseminate false and misleading information for the purpose of disrupting an organizational restructuring to which he objected." J.A. 1604. It raised several arguments as to Dragoon, Noble, and Swift, including that the ALJ had impermissibly amended the General Counsel's complaint as to those three employees by finding that the "instant messaging chats about the spreadsheet and Bendel's termination" were protected conduct. J.A. 1615. Finally, it challenged the remedies of reinstatement and financial compensation that the ALJ had ordered.

8

The Board affirmed the ALJ's decision.  As to Bendel, the Board largely adopted the ALJ's findings and noted that VIP's "shifting explanations for Bendel's discharge [were] additional evidence of animus towards his protected concerted activity." J.A. 1733 n.5.  Regarding Dragoon, Noble, and Swift, the Board first "clarif[ied] that the relevant protected concerted activity that these employees engaged in and for which [VIP] discharged them is their online chat communications about the salary spreadsheet, workplace conditions, and frustration over Bendel's recent discharge." *Id.*  It then "adopt[ed] the [ALJ's] pretext findings for the . . . reasons that the [ALJ] stated." *Id.*

The Board ordered several remedies, two of which VIP challenges here.  First, it ordered VIP to offer reinstatement to the discharged employees, even though all four of them had already secured work elsewhere and had expressed no interest in returning to VIP.  Second, it ordered VIP to provide each employee with a make-whole financial remedy, including backpay and "reasonable search-for-work and interim employment expenses, if any, regardless of whether these expenses exceed interim earnings," consistent with the Board's earlier decision in *Thryv, Inc.*  J.A. 1734 (citing 372 NLRB No. 22, 2022 WL 17974951 (Dec. 13, 2022), *vacated in part on other grounds*, 102 F.4th 727 (5th Cir. 2024)).

VIP petitions for our review, and the NLRB cross-applies for enforcement of its order.  We have jurisdiction under 29 U.S.C. § 160(e)–(f).

### III. Standard of Review

We will "uphold the judgment of the Board unless, upon reviewing the record as a whole, we conclude that the Board's findings are not supported by substantial evidence, or that the Board acted arbitrarily or otherwise erred in applying established law to the facts of the case." *DHSC, LLC v. NLRB,*

9

944 F.3d 934, 937 (D.C. Cir. 2019) (citation omitted). Evidence qualifies as "substantial" when "a reasonable mind might accept [it] as adequate to support a conclusion." *McLamb v. NLRB*, 141 F.4th 1308, 1315 (D.C. Cir. 2025) (cleaned up). Thus, "we may not displace the Board's choice between two fairly conflicting views, even though we would justifiably have made a different choice had the matter been before us *de novo*." *Id.* at 1315–16 (cleaned up).

## IV. Analysis

### A. Christopher Bendel

The NLRA protects the right of employees "to engage in . . . concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. If an employer "interfere[s] with" that right, the employer has committed an unfair labor practice. *Id.* § 158. We and the NLRB have recognized that the NLRA's protections extend to salary sharing among employees. *See Banner Health Sys. v. NLRB*, 851 F.3d 35, 41 (D.C. Cir. 2017).

The parties agree that the NLRB's *Wright Line* framework — which applies "[w]hen an employer claims to have discharged an employee for legitimate reasons" — governs this case. *Windsor Redding Care Ctr., LLC v. NLRB*, 944 F.3d 294, 298 (D.C. Cir. 2019) (discussing *Wright Line, a Div. of Wright Line, Inc.*, 251 NLRB 1083 (1980), *enforced*, 662 F.2d 899 (1st Cir. 1981)). That framework has two steps: "At step one, the General Counsel for the Board must make out a *prima facie* case that the employee's protected activity was a motivating factor in the employer's decision to fire her." *Id.* "If the General Counsel carries that burden, the analysis proceeds to step two, at which the burden of persuasion shifts to the employer to show that it

10

would have taken the same action in the absence of the unlawful motive." *Id.* (cleaned up).

It is undisputed that the General Counsel has satisfied the first step of the *Wright Line* framework: VIP concedes that "Bendel's role in creating and disseminating the [salary] spreadsheet factored into his dismissal." Opening Br. 7. VIP instead focuses on the second *Wright Line* step, arguing that the company would have fired Bendel even if it had not discovered the spreadsheet. *See Windsor Redding*, 944 F.3d at 298.

In ruling against VIP and concluding that the company illegally discharged Bendel, the Board reasoned that "[t]he timing of the terminations and the lack of any credible evidence that [VIP] planned to discharge [Bendel] prior to [the day that management learned of the spreadsheet] supports the inference of discriminatory discharge." J.A. 1739.[3] The Board also "rel[ied] on [VIP's] shifting explanations for Bendel's discharge as . . . evidence of animus towards his protected concerted activity." J.A. 1733 n.5. Substantial evidence in the record supports the Board's determinations. *See DHSC*, 944 F.3d at 937. For example, the record reflects that Bendel was terminated within seventy minutes of management finding out about the spreadsheet; and before that day, management had

---

[3] The Board did not view the timing of the spreadsheet's removal as "sufficient, on its own, to establish [VIP's] animus." J.A. 1733 n.5. But the Board did not, as VIP suggests, determine that the rapidity of the spreadsheet's removal could play no role in establishing animus. *Cf. RAV Truck & Trailer Repairs, Inc. v. NLRB*, 997 F.3d 314, 325 (D.C. Cir. 2021) ("Petitioner discharged [its employee] less than twenty-four hours after the Union filed its first petition. This timing supports an inference of unlawful motive.").

11

made no mention of firing Bendel and had planned to give him a new role in the restructured company.

VIP nevertheless insists that numerous lawful considerations motivated its decision to fire Bendel. But at bottom, VIP's arguments are unpersuasive: The Board reasonably rejected the company's version of events, and we review the Board's decision deferentially. *See DHSC*, 944 F.3d at 937 ("Substantial evidence is not a high bar.").

First, VIP claims that it did not fire Bendel for salary sharing, but rather because he used the "spreadsheet to disrupt the roll-out of the restructuring plan and to immunize himself against possible termination." Opening Br. 23–24. In other words, VIP argues that it objected only to the manner, timing, and motive behind Bendel's salary-sharing activity. But VIP cites no authority that permits an employer to terminate an employee for engaging in protected conduct in a disfavored manner or for disfavored reasons. Such a loophole would enable employers to evade the NLRA's requirements by simply framing their antipathy to lawful activity in terms of its potential for "disruption." VIP's disapproval of the circumstances that surrounded the creation and dissemination of the salary-sharing spreadsheet is just "another way of indicating that [Bendel] was terminated because he engaged in protected concerted activity." *Citizens Inv. Servs. Corp. v. NLRB*, 430 F.3d 1195, 1203 (D.C. Cir. 2005).

Second, VIP claims that it fired Bendel for using VIP's information-technology "resources to create, disseminate and host documents for non-business purposes." Opening Br. 26. To be sure, employers enjoy a circumscribed right to restrict NLRA-protected activity on company time and on certain company property. *See Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 798–99 (1945); *see also Caesars Ent.*, 368 NLRB

12

No. 143, 2019 WL 6896714, at *8 (Dec. 16, 2019) (exploring *Republic Aviation*'s bearing on "virtual space[s]," like "email system[s]"). But here, the record does not support VIP's claim that it fired Bendel for such a transgression. The executives who discussed Bendel's alleged misconduct and decided to terminate him did not cite his use of VIP resources as a factor in their decision-making. In fact, Morgan "kind of chuckled" at how developers other than Bendel were modifying the spreadsheet. J.A. 1052–53. And Simard — the man who led the charge in firing Bendel — testified, as to the other developers' spreadsheet entries, "We didn't care. It [didn't] matter." J.A. 1053. Finally, VIP offered no evidence that it has ever disciplined any other employee for using its digital resources for purported "non-business purposes," and certainly not for such brief use on a single occasion.

Third, VIP claims that it fired Bendel for disseminating a "misleading and confusing document" — conduct that VIP implies falls outside the NLRA's protection. Opening Br. 13. Even if we assume that certain salary-sharing efforts might be so "maliciously untrue" as to lose their protected status, the Board determined that the spreadsheet at issue was not "materially inaccurate." J.A. 1740. Most notably, it found that the "100% underpaid" notation was "a statement of opinion, not an inaccurate statement of fact." J.A. 1740 n.13. VIP offers no basis for us to overturn the Board's factual finding about the spreadsheet's accuracy.

Finally, VIP claims that it fired Bendel for his hostility toward the company, as demonstrated by his messages with his coworkers, his meetings with Graefe and McGinty, and his disclosure that he had received other job offers. But VIP fired Bendel before discovering his messages to coworkers, so those messages could not have factored into his termination. Moreover, even though Bendel's meetings with his managers

13

about the restructuring went poorly, neither Graefe nor McGinty indicated in post-meeting discussions that they might fire Bendel.  To the contrary, McGinty expressed his hope that, despite Bendel's dissatisfaction with the restructuring, "[Bendel] could play a role in planning it."  S.J.A. 5.  And Graefe accepted "some of the blame" for his poor discussion with Bendel.  *Id.*  Further, despite Bendel's disclosure that "he had offers from other companies," J.A. 851, VIP had planned to give Bendel a specific role within the restructured company.

In sum, substantial evidence supports the Board's determination that Bendel's termination was triggered by management's discovery of the salary-sharing spreadsheet.  Within about ninety minutes of discovering the spreadsheet, VIP management disabled Bendel's account, fired him, and took down the spreadsheet.  VIP's contrary arguments rely on an alternative view of the facts that the Board reasonably rejected.

**B. Gordon Dragoon, Kaleb Noble, and Kestrel Swift**

VIP argues that we should vacate the Board's findings in favor of Dragoon, Noble, and Swift because the Board "impermissibly found a violation based on uncharged conduct."  Opening Br. 28.  We agree.

"The Due Process Clause and the [Administrative Procedure Act] require that an agency setting a matter for hearing provide parties with adequate notice of the issues that [will] be considered, and ultimately resolved, at that hearing.  This requirement ensures the parties' right to present rebuttal evidence on all matters decided at the hearing."  *Pub. Serv. Comm'n of Ky. v. FERC*, 397 F.3d 1004, 1012 (D.C. Cir. 2005) (cleaned up); *see also* 5 U.S.C. §§ 554(b), 556(d).  But "it is well settled that the Board may find and remedy a violation even in the absence of a specified allegation in the complaint if

14

the issue is closely connected to the subject matter of the complaint and has been fully litigated." *Casino Ready Mix, Inc. v. NLRB*, 321 F.3d 1190, 1199–200 (D.C. Cir. 2003) (cleaned up). Thus, where "the difference between the charge made and the violation found . . . is small," we will "not require . . . the General Counsel to re-try the case." *Pergament United Sales, Inc. v. NLRB*, 920 F.2d 130, 136 (2d Cir. 1990).

Here, there are discrepancies between the conduct charged in the complaint, and the determinations made by both the ALJ and the Board. The General Counsel's complaint alleged that VIP fired Dragoon, Noble, and Swift for "engag[ing] in concerted activities with each other and with other employees for the purposes of mutual aid and protection, *by creating and disseminating a spreadsheet where employees could view and share salary information.*" J.A. 1258 (emphasis added). The ALJ, however, found that VIP fired those three employees "for their instant messaging chats about the spreadsheet and Bendel's termination," noting that the messages were "inextricably linked to their roles in creating and disseminating the spreadsheet." J.A. 1739. The Board took it a step further: It "clarif[ied] that the relevant protected concerted activity that [Dragoon, Noble, and Swift] engaged in and for which [VIP] discharged them is their online chat communications about the salary spreadsheet, workplace conditions, and frustration over Bendel's recent discharge." J.A. 1733. The issue before us is whether the ALJ and the Board permissibly relied on factors that were "closely connected to the subject matter of the complaint," or instead unfairly considered issues for which VIP lacked adequate notice. *Casino Ready Mix*, 321 F.3d at 1200 (citation omitted).

As to the ALJ's ruling, we discern no error. The General Counsel's complaint alleged a violation based on VIP's response to the employees' creation and dissemination of a

15

salary-sharing spreadsheet. The ALJ expanded the relevant conduct to encompass "instant messaging chats about the spreadsheet and Bendel's termination." J.A. 1739. In the ALJ's words, those chats were "inextricably linked to [Dragoon's, Noble's, and Swift's] roles in creating and disseminating the spreadsheet." *Id.* We agree. When a group of employees builds and circulates a spreadsheet, the participants necessarily will discuss that common endeavor. And when management fires one member of the group for his actions related to that spreadsheet, his compatriots' discussion of what happened is an extension of the group's collaboration on the spreadsheet. The ALJ did not meaningfully change the scope of the protected conduct alleged in the complaint when he considered the employees' messages about the spreadsheet and Bendel's termination, which were closely connected to the creation and dissemination of the spreadsheet.

The Board, however, further enlarged the relevant conduct to include "online chat communications about . . . workplace conditions." J.A. 1733. In so doing, the Board stretched the charged conduct beyond its breaking point. "Workplace conditions" is a far-reaching category that can encompass anything from salaries to cafeteria options to interpersonal office dynamics. The employees' chats covered a wide range of topics, some of which do not appear "closely connected to the subject matter of the complaint" — *i.e.*, salary sharing. *Casino Ready Mix*, 321 F.3d at 1200 (citation omitted). The Board's invocation of those unrelated chats therefore violated VIP's due-process rights. *See id.* VIP did not have notice that its employees' discussion of workplace conditions might be considered protected conduct at the hearing, and the company therefore had no opportunity to rebut arguments to that effect. *See Pub. Serv. Comm'n of Ky.*, 397 F.3d at 1012.

16

The NLRB's claims to the contrary come up short.[4]  First, the NLRB argues that all the employees' "workplace conditions" messages, no matter how seemingly unrelated to their salary sharing, are "protected by association because [they] occur[ed] within the context of protected conduct."  Oral Arg. 1:11:09–15.  But the Board did not cite this reasoning below and therefore cannot raise it now.  *See SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based."); *see also NLRB v. CNN Am., Inc.*, 865 F.3d 740, 751 (D.C. Cir. 2017) (applying *Chenery* to the NLRB).

Second, the NLRB suggests that the only "workplace conditions" chats on which it relied were those that pertained to salaries, Bendel's firing, and other "closely connected" topics.  But nothing in the record makes that clear, and the NLRB cannot rely on *post hoc* explanations to support its order.  *See Chenery*, 318 U.S. at 87.  In any event, even if the NLRB in fact relied only on "workplace conditions" chats connected to salary sharing, its failure to explain that reasoning when it rendered its decision was arbitrary and capricious.  *Cf. Pub. Serv. Comm'n of Ky.*, 397 F.3d at 1012.

We need not set aside a Board decision based on an error that did not prejudice the aggrieved party.  *See Davis*

---

[4]  At the threshold, the NLRB argues that VIP has not preserved its due-process argument:  According to the NLRB, "VIP should have filed a motion for reconsideration to preserve its objection."  Response Br. 41.  But before the Board, VIP argued that the ALJ had "violated fundamental principles of due process" by treating the employees' "comments in the group chat" as protected.  J.A. 1654–55.  That was sufficient to preserve VIP's due-process claim for our review.

17

*Supermarkets, Inc. v. NLRB*, 2 F.3d 1162, 1169 (D.C. Cir. 1993). But here, the Board's reference to uncharged conduct was not harmless. In the proceedings below, VIP sought to refute the complaint's allegation that the company had terminated Dragoon, Noble, and Swift for "creating and disseminating a salary-sharing spreadsheet" by highlighting the employees' poor attitude, as evidenced by their unprofessional messages to each other. For example, VIP argued that those messages showed that the employees were "'on the verge of quitting' and making a 'pact' to take another developer with them, discussing 'purging' VIP computers, and collaborating with individuals outside of VIP" to harm the company. J.A. 1665–66.

Had VIP known that the Board might view some of those messages as protected statements about "workplace conditions," VIP likely would have tailored its defense to rely only on messages that the Board viewed as unprotected. Alternatively, had VIP known that the Board might view *all* the messages as protected conduct, VIP could "have expanded its defense [beyond the messages] to emphasize and corroborate the employees' disloyalty and imminent plans to quit." Opening Br. 29. Specifically, VIP says that it "would likely have called other employees as witnesses and introduced additional evidence (including other chat transcripts)" that were not before the Board. *Id.* at 30.

The Board's eleventh-hour adoption of a "workplace conditions" theory thus "preclude[d VIP] from effectively presenting its case." *Midwest Terminals of Toledo Int'l, Inc. v. NLRB*, 783 F. App'x 1, 6 (D.C. Cir. 2019) (per curiam) (citation omitted); *see also Davis Supermarkets*, 2 F.3d at 1169 (indicating that prejudice may exist where the Board's reliance on uncharged conduct prevents a company from advancing a "significant defense"). Although the Board found that VIP's

18

concerns about purging computers, disseminating inaccurate information, and using company technology were pretextual, it did not draw any such conclusions about the employees' discussions of quitting and of communicating with a former employee.  New arguments and evidence related to such discussions therefore might have presented a significant defense to the Board's workplace-conditions theory.[5]

Because the Board prejudicially erred by citing "online chat communications about . . . workplace conditions" as protected conduct when the complaint did not charge such conduct, J.A. 1733, we vacate the Board's conclusion that VIP engaged in unfair labor practices as to Dragoon, Noble, and Swift, and remand their cases for further consideration consistent with this opinion.

### C. Bendel's Remedies

VIP contests the Board's order that the fired employees be reinstated and "made whole" financially.  Because we remand for further proceedings as to Dragoon, Noble, and Swift, we address only the remedies awarded to Bendel.  We grant the NLRB's motion to enforce as to Bendel because (1) the Board acted within its discretion when it ordered VIP to reinstate Bendel to his former position, and (2) VIP has not preserved its challenges to the make-whole financial remedy.

---

[5]    The NLRB also insists that VIP could not have suffered prejudice because "VIP had the opportunity to, and did, litigate claims that it fired [Dragoon, Noble, and Swift] for discussing the spreadsheet, their workplace conditions, and Bendel's termination." Response Br. 40.  But that argument simply begs the question by not engaging at all with the meaning of "workplace conditions."

19

1. *Reinstatement*

In fashioning a remedy for an unlawful labor practice, the Board may "take such affirmative action[,] including reinstatement of employees with or without back pay, as will effectuate the policies of [the NLRA]." 29 U.S.C. § 160(c). We will uphold a reinstatement remedy "unless the employer can show undue hardship." *Teamsters Local Union No. 171 v. NLRB*, 863 F.2d 946, 957 (D.C. Cir. 1988). Such hardship exists, for example, where "compliance with the order is unduly economically burdensome" or where the order "is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the" NLRA. *Id.* at 957–58 (citation omitted).

Here, VIP's challenge to the Board's order of reinstatement relies on a single Second Circuit case that overturned a reinstatement remedy under circumstances that are readily distinguishable. *See KBI Sec. Serv., Inc. v. NLRB*, 91 F.3d 291, 295–96 (2d Cir. 1996). In *KBI*, the court determined that a reinstatement order "would place an undue burden on the employer" if the to-be-reinstated employees had committed theft while at work. *Id.* at 292. The court remanded the case so that the agency could develop the factual record concerning whether the employees had committed the alleged thefts. *Id.* at 296. As the Second Circuit later explained, where an employee's discharge was motivated by both a "proper" reason (*e.g.*, alleged theft) and an "improper" reason (*e.g.*, illegal anti-union animus), the "proper" reason for discharge can sometimes "render[] reinstatement an undue burden." *NLRB v. G & T Terminal Packaging Co.*, 246 F.3d 103, 122 (2d Cir. 2001).

VIP asserts that *KBI* governs because, "just as a security company [like KBI] should not have to reinstate a thief for risk

20

of reputational harm, a software company should not have to restore [a] disloyal and untrustworthy engineer[]." Opening Br. 46 (cleaned up). But even if we assume that *KBI*'s reasoning is persuasive, VIP's argument fails because it is premised on a factual claim that the Board did not credit — *i.e.*, that Bendel was terminated, at least in part, for being "disloyal and untrustworthy." As explained *supra* section IV.A, the Board reasonably rejected VIP's arguments concerning Bendel's alleged disloyalty and untrustworthiness as entirely pretextual. Thus, unlike in *KBI*, VIP had no "proper reason" to terminate Bendel. *See G & T Terminal Packaging*, 246 F.3d at 122 (explaining that *KBI* applies when an employee is discharged for "both a proper reason . . . and an improper reason").

VIP also argues that the remedy is improper because Bendel quickly found a new job and because the Board made no finding that Bendel desired reinstatement. That argument is unpersuasive because it fails to acknowledge the Board's goal of "effectuat[ing] the policies of the" NLRA. 29 U.S.C. § 160(c). VIP illegally terminated Bendel, and an offer of reinstatement directly addresses that wrong, even if Bendel ultimately declines to return to VIP. A contrary ruling would undermine the purpose of the NLRA, *see id.* § 151, by disadvantaging Bendel for seeking new employment. We "extend broad deference to the Board's choice of remedies," and we will "upset the Board's choice of how best to effectuate the policies of the" NLRA "only when a remedy is clearly inadequate." *Microimage Display Div. of Xidex Corp. v. NLRB*, 924 F.2d 245, 254 (D.C. Cir. 1991) (cleaned up). VIP has not made the requisite showing here.

21

2. *Make-Whole Financial Remedy*

"One important policy goal [of the NLRA] is to achieve a restoration of the situation, as nearly as possible, to that which would have obtained but for the illegal discrimination." *King Soopers, Inc. v. NLRB*, 859 F.3d 23, 38 (D.C. Cir. 2017) (cleaned up). To advance that goal, the Board often orders employers to "make whole" wrongfully discharged employees — *i.e.*, by giving them backpay and by reimbursing certain expenses, historically identified on a case-by-case basis. *See id.*; *see also NLRB v. Strong*, 393 U.S. 357, 359 (1969) ("Making the workers whole for losses suffered on account of an unfair labor practice is part of the vindication of the public policy which the Board enforces." (cleaned up)).

In its 2022 decision in *Thryv*, the Board adopted a new formulation of its make-whole remedy. *See* 2022 WL 17974951, at *9, *21 n.14. Prior to *Thryv*, in order to "ensure[] affected employees [were] made whole for the consequences of a respondent's unlawful conduct," the Board typically ordered the respondent to provide backpay; and it sometimes would consider whether the respondent should also compensate employees for other related costs, such as reasonable search-for-work expenses. *Id.* at *9–10. *Thryv* standardized the Board's practice by establishing "that in all cases in which our standard remedy would include an order for make-whole relief, the Board will expressly order that the respondent compensate affected employees for *all direct or foreseeable pecuniary harms* suffered as a result of the respondent's unfair labor practice." *Id.* at *9 (emphasis in original). *Thryv* also explained that respondents should reimburse such "direct or foreseeable pecuniary harms" "without regard to a discriminatee's interim earnings." *Id.* at *9, *21 n.14. In other words, an employee must receive compensation for all direct or foreseeable pecuniary harms,

22

even if his interim employment pays more than he would have earned in his former job — which means that the employee theoretically could end up better off than he would have been had he not been wrongfully terminated.

Citing *Thryv*, the ALJ ordered VIP to compensate Bendel "for all direct or foreseeable pecuniary harms that [he] suffered as a result of [VIP's] unfair labor practices, regardless of whether these expenses exceed interim earnings." J.A. 1740–41. VIP challenged this remedy in its exceptions to the ALJ's decision. In a section entitled, "The proposed remedies are unreasonably burdensome and punitive," VIP devoted a paragraph to the make-whole remedy. J.A. 1674, 1677. In full, that paragraph read:

> The ALJ appears to have ordered remedies that impermissibly exceed make-whole remedies. The [ALJ] proposes that VIP be ordered to compensate the charging parties "for any loss" of benefits and "for all direct or foreseeable pecuniary harms that they suffered as a result of Respondent's unfair labor practices, regardless of whether those expenses exceed interim earnings." If the ALJ proposes ordering compensation for a loss of net salary and benefits even if their net salary and benefits from their new employment exceeds what they would have received had they remained at VIP, that is not a "make whole" remedy authorized by the Act. It would provide the charging parties with an unwarranted and unauthorized windfall and impose a punitive and unlawful penalty on VIP that is inconsistent with the remedial purposes of the remedies authorized by the Act.

23

J.A. 1677 (cleaned up).

As this paragraph makes clear, VIP's argument below amounted to a claim that the four employees would receive a "windfall." *See King Soopers*, 859 F.3d at 39 (describing the contention that "a financial windfall" exists where "a claimant's interim earnings [from his new employment] equal or exceed the sum of his lost earnings and employment-search expense"). The Board rejected that argument and upheld the ALJ's make-whole remedy, ordering VIP to "compensate [the four employees] for any other direct or foreseeable pecuniary harms incurred as a result of the unlawful termination of their employment, including reasonable search-for-work and interim employment expenses, if any, regardless of whether these expenses exceed interim earnings." J.A. 1734.

In its petition for review, VIP abandons the "windfall" argument that it advanced below and instead launches a broadside attack against the *Thryv* remedy. It claims that the "expansive *Thryv* remedy is no longer an equitable 'make whole' remedy" but rather a form of "compensatory damages," which the NLRB supposedly lacks the statutory authority to award. Opening Br. 49. To support that assertion, VIP devotes eleven pages of briefing to arguments drawing on statutory language, legislative history, an analogy to Title VII, and the constitutional-avoidance doctrine.

VIP advanced none of those arguments below and therefore has not preserved its facial challenge to the *Thryv* remedy. *See* 29 U.S.C. § 160(e) ("No objection that has not been urged before the Board . . . shall be considered by the court . . . [absent] extraordinary circumstances."). Under § 160(e), "the critical inquiry is whether the objections made before the Board were adequate to put the Board on notice that the issue might be pursued on appeal." *Consol. Freightways v.*

24

*NLRB*, 669 F.2d 790, 794 (D.C. Cir. 1981). Applying that standard, we have consistently disclaimed jurisdiction when a party objects to a given action (*e.g.*, a remedy) before the Board and then presents a different objection to the same action before this court. *See, e.g.*, *DHL Express, Inc. v. NLRB*, 813 F.3d 365, 372 (D.C. Cir. 2016) (distinguishing between an argument challenging the "validity of [a] presumption" and one challenging the "application of that presumption"); *Stephens Media, LLC v. NLRB*, 677 F.3d 1241, 1254–55 (D.C. Cir. 2012); *Majestic Star Casino, LLC v. NLRB*, 373 F.3d 1345, 1349 (D.C. Cir. 2004) ("[T]he company put forward [a] wholly distinct argument [below.]").

Before the Board, VIP advanced an argument that the remedy in this case provided Bendel with an unjustifiable "windfall." It did not mention "*Thryv*," "legislative history," "Title VII," or "constitutional avoidance" in any of its filings. In other words, VIP did "not challenge the Board's standard remedial language" from *Thryv*; "instead, it argue[d] that, for case-specific reasons, a particular remedy should not be imposed." *Logmet, LLC v. NLRB*, No. 21-1273, 2022 WL 15603866, at *1 (D.C. Cir. Oct. 28, 2022). VIP may not assert for the first time before this court that the Board's earlier decision in *Thryv* violates the NLRA. We lack authority under § 160(e) to consider that unpreserved argument.

Our dissenting colleague resists our straightforward application of § 160(e). In so doing, he relies heavily on a single case: *Camelot Terrace, Inc. v. NLRB*, 824 F.3d 1085 (D.C. Cir. 2016). That decision took a generous approach to issue preservation, but it is not comparable to what happened here. In *Camelot Terrace*, the petitioner made arguments before the Board and before this court expressly challenging the Board's asserted authority to award "bargaining costs." *Id.* at 1090–91.

25

But here, as discussed, VIP did not alert the Board to any general challenge to the *Thryv* remedy and did not even mention *Thryv* in its Board filings.  Even if VIP characterized the specific remedy in this case as "unreasonably burdensome and punitive" and "impermissibly exce[ssive]" — as our dissenting colleague emphasizes — that did not preserve a facial challenge to the *Thryv* remedy.  VIP simply did not "put the Board on notice that the [*Thryv*] issue might be pursued on appeal."  *Consol. Freightways*, 669 F.2d at 794.

In our view, other cases are more on point than *Camelot Terrace*.  For example, in *Advancepierre Foods, Inc. v. NLRB*, we held that we lacked jurisdiction over the petitioner's "frontal attack on Board precedent" where the petitioner had not "challenge[d that precedent] before the Board" but had instead focused on case-specific, fact-bound issues.  966 F.3d 813, 819 (D.C. Cir. 2020); *see also id.* ("Because AdvancePierre's frontal attack on Board precedent was never made to the Board and extraordinary circumstances do not excuse its failure, we cannot reach this argument.").[6]  And in *Enterprise Leasing Co. of Florida v. NLRB*, we disclaimed jurisdiction over the argument that a type of remedy was categorically "impermissibly punitive or otherwise unlawful" where the petitioner previously had pressed only a fact-bound

---

[6]     The dissent argues that *Advancepierre* is off point because the petitioner there "had implicitly" affirmed the Board precedent that it later challenged in this court.  Dissenting Op. 12 n.47.  Though *Advancepierre* observed in a footnote the petitioner's prior "support of the ALJ's decision applying [the Board precedent at issue]," it did not emphasize, or rest its holding on, that observation.  966 F.3d at 819 n.6.  Instead, *Advancepierre* explained that the petitioner had only "made passing reference" to its unpreserved appellate argument before the Board, *id.* — the exact basis on which the dissent here proposes to hold VIP's appellate argument preserved.

26

challenge to a particular application of that remedy (*i.e.*, contesting "the *dates* of its . . . obligations" under the remedy). 831 F.3d 534, 550–51 (D.C. Cir. 2016) (emphasis added).[7]

### 3. *Constitutional Challenge to the Make-Whole Remedy*

In its petition for review, VIP also argues that *Thryv*'s formulation of the required remedy treats the underlying dispute as a private-rights claim, which, under the Seventh Amendment, may be addressed only by Article III courts. *See SEC v. Jarkesy*, 603 U.S. 109, 127–28 (2024).  We lack jurisdiction to resolve this unpreserved challenge — even VIP concedes that it "did not directly raise" this argument before the Board.  Opening Br. 54.  We are unconvinced by VIP's contention that *Jarkesy* constitutes an "intervening change in the law" that excuses its failure to preserve its claim.  *Id.* at 54–55; *see also Stoiber v. SEC*, 161 F.3d 745, 754 (D.C. Cir. 1998) ("The failure to raise an issue in a prior forum is excusable when due to an intervening change in the law . . . .").  The Supreme Court decided *Jarkesy* in June 2024, and the Board did not issue its opinion below until November 2024.  Thus, VIP could have brought *Jarkesy* to the Board's attention as supplemental authority while the case was pending, or VIP could have moved for reconsideration or rehearing based on *Jarkesy*.  *See* 29 C.F.R. §§ 102.6, 102.48 (2024).  VIP's failure to do so renders us "jurisdictionally barred from considering"

---

[7]    In critiquing our reliance on *Enterprise Leasing*, the dissent focuses on an inapposite portion of that opinion addressing the petitioner's exceptions to the ALJ's decision.  That discussion was distinct from *Enterprise Leasing*'s holding, which turned instead on the petitioner's attempt to press in this court a categorical, facial objection to the remedy imposed when it had not made any such objection before the Board in response to the "General Counsel's exceptions that first requested" the remedy.  831 F.3d at 550–51.

27

the argument now.  *NLRB v. Chipotle Servs., LLC*, 849 F.3d 1161, 1162 & n.3 (8th Cir. 2017).

VIP also contends that we should forgive its failure to raise a Seventh Amendment challenge below because doing so "would [have been] futile because of certainty of an adverse decision." *Randolph-Sheppard Vendors of Am. v. Weinberger*, 795 F.2d 90, 105 (D.C. Cir. 1986) (cleaned up).  But futility is a high bar, and VIP fails to identify "a very clearly articulated agency position" applying *Jarkesy*'s holding in the present context.  *KPMG, LLP v. SEC*, 289 F.3d 109, 118 (D.C. Cir. 2002).  We thus cannot consider VIP's Seventh Amendment argument.  *See* 29 U.S.C. § 160(e).

*       *       *

For the foregoing reasons, we deny VIP's petition for review and grant the NLRB's cross-application for enforcement as to employee Christopher Bendel.  We grant VIP's petition for review and deny the NLRB's cross-application for enforcement as to employees Gordon Dragoon, Kaleb Noble, and Kestrel Swift.  We remand for further proceedings consistent with this opinion.

*So ordered.*

WALKER, *Circuit Judge*, concurring in part and dissenting in part:

The National Labor Relations Board concluded that Vermont Information Processing unlawfully fired Christopher Bendel for engaging in protected concerted activity. The NLRB's remedy included compensation for "direct or foreseeable pecuniary harms incurred . . . , including reasonable search-for-work and interim employment expenses, if any, regardless of whether these expenses exceed interim earnings."[1] VIP argues the NLRB does not have the statutory authority to make that award. I agree and would vacate that part of the NLRB's order.

## I. The Pecuniary-Harms Remedy Exceeds the NLRB's Remedial Authority Under § 10(c)

### A. NLRB Remedies After *Thryv*

Before 2022, the NLRB's remedies typically centered on reinstatement and backpay. The Supreme Court has made clear that, in this context, those are equitable remedies.[2]

Then, in 2022, the NLRB decided *Thryv, Inc.* It announced that the standard make-whole remedy going forward would include compensation "for all direct or

---

[1] JA 1734.

[2] *See Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 901 (1984) (describing backpay awards under the National Labor Relations Act as "equitable"); *Curtis v. Loether*, 415 U.S. 189, 197 (1974) ("In Title VII cases the courts of appeals have characterized back pay as an integral part of an equitable remedy, a form of restitution."); *see also Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988) (describing "an order providing for the reinstatement of an employee with backpay" as "an equitable action for specific relief"). *But cf. infra*, note 12.

2

foreseeable pecuniary harms suffered as a result of [an] unfair labor practice."[3]

*Thryv* gave examples of what these harms might include: "interest and late fees on credit cards, or penalties if [an employee] must make early withdrawals from her retirement account in order to cover her living expenses," loss of the employee's car or home "if she is unable to make loan or mortgage payments," and "increased transportation or childcare costs."[4]

In all, the "pecuniary harms" category appears to function as a catch-all to compensate employees for any extra expenses they may incur due to the loss of a job and paycheck. If the employee was unable to make credit-card payments, the employer is responsible for the late fees. If the employee loses a home or car for the same reason, the employer must pay whatever it takes to compensate for those losses.

*Thryv* remedies differ from the NLRB's traditional remedies in an important formal way. Whereas the traditional remedies are equitable, *Thryv* remedies require the employer to pay legal damages.

Let's unpack that, beginning with a classic case that awarded an equitable remedy. Zehmer contracted to sell a farm to Lucy. Zehmer breached. The court did not order Zehmer to pay damages, which would be a legal remedy. Instead, the

---

[3] 372 NLRB No. 22, slip op. at 13 (Dec. 13, 2022).

[4] *Id.* at 9 (quoting *Voorhees Care & Rehabilitation Center*, 371 NLRB No. 22, slip op. at 4 n.14 (2021)).

3

court ordered Zehmer to sell Lucy the farm — an equitable remedy.[5]

In contrast, *Thryv* authorizes a version of consequential damages.[6]   Here again, consider a classic case.   When Baxendale delayed the reopening of Hadley's mill by failing to deliver an essential crankshaft, Baxendale was liable for damages that either arose naturally from the breach in the ordinary course of events or were reasonably within both parties' contemplation at the time of contracting.[7]   The case stands for the proposition that in some situations a plaintiff can recover for "direct and foreseeable" harms — "a quintessential form of legal damages."[8]

In today's case, the NLRB ordered VIP to reinstate Christopher Bendel and give him backpay — equitable relief long understood to be authorized by the National Labor Relations Act.   But the NLRB *also* ordered VIP to pay Christopher Bendel "for any other direct or foreseeable

---

[5] *See Lucy v. Zehmer*, 196 Va. 493, 504 (1954) ("generally, where a contract is in its nature and circumstances unobjectionable, it is as much a matter of course for courts of equity to decree a specific performance of it as it is for a court of law to give damages for a breach of it").

[6] *See 3484, Inc. v. NLRB*, 137 F.4th 1093, 1121 (10th Cir. 2025) (Eid, J., concurring in part and dissenting in part) ("Congress has never authorized the Board to award . . . tort-like legal damages"); *id.* (calling the standard *Thryv* remedy "an award of compensatory and consequential damages" regardless of "how the Board labels it").

[7] *Hadley v. Baxendale,* 9 Exch. 341 (Eng. 1854); *see also Remedy*, Black's Law Dictionary (12th ed. 2024) (describing an award of damages as the typical legal remedy).

[8] *Trader Joe's Co. v. NLRB*, 167 F.4th 766, 801–02 (5th Cir. 2026) (Oldham, J., dissenting).

4

pecuniary harms incurred."[9]  That *Thryv* award converted the NLRA's equitable remedial scheme into a general compensatory-damages regime.

### B. The Scope of § 10(c)'s Remedial Grant

By passing the National Labor Relations Act, "Congress did not establish a general scheme authorizing the Board to award full compensatory damages for injuries caused by wrongful conduct."[10]  On the contrary, § 10(c) defines the NLRB's remedial authority in familiar equitable terms.

Section 10(c) provides that if the NLRB finds that a person "has engaged in or is engaging in [an] unfair labor practice," the NLRB "**shall issue and cause to be served on such person an order requiring such person** to cease and desist from such unfair labor practice, **and to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this subchapter**."[11]

For four reasons — and a fifth if you look to legislative history — § 10(c) does not authorize compensatory relief for other losses flowing from an employer's wrongdoing.

*First*, the text refers only to equitable relief.  It lists two examples of the "affirmative action" the NLRB may take: reinstatement and backpay, both classic forms of equitable relief according to Supreme Court and D.C. Circuit

---

[9] JA 1734.

[10] *UAW-CIO v. Russell*, 356 U.S. 634, 643 (1958).

[11] 29 U.S.C. § 160(b), (c) (emphases added).

5

precedent.[12]  It does not mention legal relief, whether damages or otherwise.  So although these two specific equitable remedies do not *exhaust* the NLRB's remedial tools,[13] they

---

[12] *See Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 187–88, 188 n.6 (1941) (implying that reinstatement is a form of "equitable relief"); *Hubbard v. EPA*, 949 F.2d 453, 462–66 (D.C. Cir. 1991) (treating reinstatement and backpay as equitable relief restoring the position and its pay); *see also Curtis*, 415 U.S. at 197 (treating "backpay as an integral part of an equitable remedy" at least in the context of Title VII).

I do not mean to suggest that all restitutionary remedies, like backpay, are by their very nature equitable.  *Cf. id.* (calling backpay "a form of restitution").  On the contrary, the Supreme Court has rightly rejected that.  *See Great-West Life & Annuity Insurance Co. v. Knudson*, 534 U.S. 204, 212 (2002) ("[N]ot all relief falling under the rubric of restitution is available in equity.  In the days of the divided bench, restitution was available in certain cases at law, and in certain others in equity.").  So if we were writing on a clean slate, we might look to the type of restitutionary remedy at issue to determine whether it is legal or equitable.  *See* Samuel L. Bray, *The System of Equitable Remedies*, 63 UCLA L. Rev. 530, 541–42 (2016); John H. Langbein, *What ERISA Means by "Equitable*,*"* 103 Colum. L. Rev. 1317, 1357–58 (2003) (discussing subrogation); *Restatement (Third) of Restitution and Unjust Enrichment* § 4 cmt. *d* (Am. L. Inst. 2011) (discussing methods for distinguishing legal and equitable restitution).

Here, though, we do not write on a clean slate.  In the context of the NLRA, the Supreme Court has already decided that backpay is an equitable remedy.  *See Sure-Tan, Inc.*, 467 U.S. at 901.  That is enough for today.

[13] *See Phelps Dodge*, 313 U.S. at 188–89 (a list that begins with "including" is illustrative, not limited to the items in the list).

6

illustrate the exclusively equitable character of the broader category.[14]

*Second*, the rest of § 10(c) confirms the broader category's equitable character. Cease-and-desist orders function like injunctions.[15] Affirmative-action remedies likewise operate like mandatory injunctions.[16] And the NLRB's remedial authority is discretionary[17] — a traditional feature of equity.[18] So taken together, the statute authorizes equitable, restorative relief: remedies that "recreate the conditions and relationships that would have been had there been no unfair labor practice."[19]

---

[14] *See, e.g.*, *United States v. Brock*, 94 F.4th 39, 57 (D.C. Cir. 2024) (an "illustrative list *illustrates* what type of conduct is encompassed by the definition, and so other unlisted forms of conduct must fit that same mold").

[15] *See Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945).

[16] *See Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 177 n.4 (1973). Though mandamus, a legal remedy, may also order actors to take certain actions, the Supreme Court has indicated that the NLRA's affirmative-action remedies are equitable remedies. *See Phelps Dodge*, 313 U.S. at 187–88, 188 n.6.

[17] *Phelps Dodge*, 313 U.S. at 197–98.

[18] *American Federation of Labor v. Watson*, 327 U.S. 582, 593 (1946) ("The power of a court of equity to act is a discretionary one.").

[19] *Camelot Terrace, Inc. v. NLRB*, 824 F.3d 1085, 1092–93 (D.C. Cir. 2016) (quoting *Franks v. Bowman Transportation Co., Inc.*, 424 U.S. 747, 769 (1976); *see also Phelps Dodge*, 313 U.S. at 194 ("compensation for the loss of wages" and "offers of employment to the victims of discrimination" serve to "restor[e] . . . the situation, as nearly as possible, to that which would have obtained but for the illegal discrimination").

7

*Third*, the structure of § 10(c) confirms the same limit by barring only reinstatement and backpay for employees "suspended or discharged for cause."[20]  The statute would not bar only those two remedies if an employee could be denied backpay but recover potentially larger sums through catch-all compensation for all foreseeable downstream financial harms.

*Fourth*, this approach better accords with the Supreme Court's understanding of the remedial provision in Title VII, and the Court interprets that provision in line with § 10(c) of the NLRA.[21]  Even Title VII's broader language — authorizing reinstatement, backpay, "or any other equitable relief" — did not permit compensatory damages until Congress amended the statute in 1991 to authorize them expressly.[22]  If that broader statute did not authorize compensatory damages, neither does this narrower one.[23]

*Fifth*, for any die-hards who still care a lot about legislative history, an early draft of the NLRA authorized the NLRB "to take affirmative action, or to pay damages, or to reinstate employees."[24]  Then, during committee hearings, critics argued

---

[20] 29 U.S.C. § 160(c).

[21] *See, e.g.*, *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 849 (2001).

[22] *See* Civil Rights Act of 1991, Pub. L. No. 102-166, § 102, 105 Stat. 1072 (codified at 42 U.S.C. § 1981a); *United States v. Burke*, 504 U.S. 229, 238 (1992) ("Title VII [as applied prior to the Civil Rights Act of 1991] does not allow awards for compensatory or punitive damages").

[23] *See Franks*, 424 U.S. at 769 n.29 ("To the extent that there is a difference in the wording of the respective provisions, § 706(g) grants, if anything, broader discretionary powers than those granted the National Labor Relations Board.").

[24] S. 2926, 73d Cong. § 205(c) (as introduced March 1, 1934).

8

that allowing the NLRB to award damages without defined standards raised "due process" concerns.[25]  Finally, Congress enacted the statute with the monetary "damages" authority omitted.

\*     \*     \*

As the Supreme Court explained long ago, the NLRA does not authorize the NLRB "to award full compensatory damages for injuries caused by wrongful conduct."[26]  Rather, Congress drew a line between equitable and legal relief, and it opted for only the former.[27]  By authorizing the NLRB to issue both, *Thryv* crosses the boundary that Congress drew — a conclusion that the Third Circuit reached in *Starbucks*, that the Fifth Circuit reached in *Hiran Management*, that Judge Eid reached in *3484*, and that Judge Oldham reached in *Trader Joe's*.[28]

---

[25] *To Create a National Labor Board: Hearing on S. 2926 Before the Senate Committee on Education & Labor*, 73d Cong. 362 (1934) (statement of James A. Emery) ("The Board may not only issue an order in the light of the complaint, it may do many more things, it may assess and require the employer to pay damages for which no rule is established; require the reinstatement of employees, or require any act which in its opinion achieves substantial justice, whatever that may be.  The Board determines that.  If that be due process of law, God save us.").

[26] *UAW-CIO*, 356 U.S. at 643.

[27] If Congress had authorized the NLRB to award legal damages, the Seventh Amendment would require a jury trial for claims seeking legal relief that are analogous to traditional common-law actions. *See SEC v. Jarkesy*, 144 S. Ct. 2117, 2130 (2024).  But VIP forfeited its argument that a *Thryv* remedy violates the Seventh Amendment by not raising that argument before the NLRB.

[28] *See NLRB v. Starbucks Corp.*, 125 F.4th 78, 95–97 (3d Cir. 2024); *Hiran Management., Inc. v. NLRB*, 157 F.4th 719, 725–29 (5th Cir.

9

## B. *King Soopers*

In *King Soopers, Inc. v. NLRB*, this court held that the NLRB can restore employees "as nearly as possible" to the position they would have occupied absent the unfair labor practice by reimbursing them for search-for-work and interim-employment costs.[29] There, the costs arose directly from the employee's duty to mitigate lost wages,[30] and the NLRB justified their reimbursement by analogy to other employment-related losses that it has long compensated separately from backpay, such as medical expenses and retirement contributions.[31] *King Soopers* concluded that when those expenses represent a distinct injury caused by the unlawful discharge, reimbursing them can permissibly produce an award that exceeds the backpay calculation.[32]

Whatever may be the faults of the NLRB's unprecedented[33] expansion of make-whole relief in *King*

---

2025); *see also 3484, Inc.*, 137 F.4th at 1125–27 (Eid, J., concurring in part and dissenting in part)*; Trader Joe's*, 167 F.4th at 801–02 (Oldham, J., dissenting) ("The *Thryv* remedy is unlawful. . . . Foreseeable pecuniary harms are a quintessential form of legal damages."); *but see International Union of Operating Engineers, Stationary Engineers, Local 39 v. NLRB*, 155 F.4th 1023, 1052–53 (9th Cir. 2025) (upholding the NLRB's authority to award foreseeable pecuniary harms when those awards are limited to make-whole remedies).

[29] 859 F.3d 23, 36–39 (D.C. Cir. 2017) (quoting *Phelps Dodge*, 313 U.S. at 194).

[30] *Id.* at 37.

[31] *Id.* at 38.

[32] *Id.* at 38–39.

[33] *See King Soopers, Inc.*, 364 NLRB 1153, 1160 (2016) ("we adopt a new policy of awarding search-for-work and interim employment

10

*Soopers*,[34] that expansion at least confined the remedy to a limited category of mitigation-related expenses tied to the employment contract. When this court reviewed that decision, it had no occasion to decide whether the NLRB can award broader categories of pecuniary damages.

\* \* \*

To put it all together, an award for pecuniary harms is a compensatory-damages award. Congress did not authorize the NLRB to order those awards. This court did not say otherwise in *King Soopers*. We should say so now and hold that the NLRB exceeded its authority when it ordered VIP to compensate Christopher Bendel "for all direct or foreseeable pecuniary harms."

## II. VIP's Challenge to the NLRB's Statutory Remedial Authority Is Properly Before Us

In the majority's view, VIP did not argue before the NLRB that a *Thryv* remedy exceeds the NLRB's statutory authority. On that basis, the majority declines to address the merits of VIP's challenge. I disagree. VIP "specifically objected in its exceptions" to the *Thryv* remedy.[35]

---

expenses regardless of discriminatees' interim earnings and separately from taxable net backpay, with interest").

[34] *See id.* at 1166 (Miscimarra, dissenting) ("my colleagues' new method for calculating backpay exceeds our statutory authority"); *id.* at 1167 ("the changes adopted by my colleagues may produce a substantial increase in contentious disputes over employment/search expenses, and these disputes, in *all* cases, are likely to delay the availability of *any* monetary remedies for employee-claimants").

[35] *Parsippany Hotel Management Co. v. NLRB*, 99 F.3d 413, 418 (D.C. Cir. 1996) (cleaned up); *see also DHL Express, Inc. v. NLRB*,

11

In its exceptions, VIP objected to the ALJ's proposal to award compensation "for all direct or foreseeable pecuniary harms . . . regardless of whether those expenses exceed interim earnings."[36] Not only does that language precisely describe the *Thryv* remedy, it quotes a part of the ALJ's proposal that followed this language with a citation to *Thryv* itself.[37] In addition, VIP's "brief in support of its exceptions adequately put the Board on notice" of its objection.[38] That brief includes a section titled "**The proposed remedies are unreasonably burdensome and punitive.**"[39] With VIP's specific objection to **"foreseeable pecuniary harms"** under a section heading objecting to **"punitive"** remedies, VIP put the NLRB on notice of its objection to the *Thryv* remedy.[40]

To be sure, VIP's examples focused on the risk of a windfall — pointing to the possibility that backpay or retirement benefits could overcompensate employees who had already secured higher-paying jobs. But VIP's illustrations do not represent the full extent of VIP's argument.[41] That

---

813 F.3d 365, 372 (D.C. Cir. 2016) (explaining that that is enough to preserve an issue for appeal).

[36] JA 1677.

[37] True, VIP didn't state that it was challenging the *Thryv* decision by name. But that does not matter. Preservation under Section 10(e) turns on notice of the *objection*, not on citation to the *precedent* the NLRB would likely rely on to defend the award.

[38] *Parsippany Hotel*, 99 F.3d at 418 (cleaned up); *see also DHL Express*, 813 F.3d at 372.

[39] JA 1623, 1674.

[40] *Consolidated Freightways v. NLRB*, 669 F.2d 790, 794 (D.C. Cir. 1981) (requiring only that the objection be "evident by the context in which it is raised").

[41] JA 1677 n.25 ("As one example . . .").

12

argument goes like this: The proposed award exceeded the NLRB's statutory authority (to award equitable relief) because the proposed remedies are "punitive" (legal damages language), and an award of "foreseeable pecuniary harms" (more damages language) is part of the problem.[42]

Would the question be easier if VIP had referred expressly to *Thryv*?  I suppose.  But the NLRB "received adequate notice of the basis for the objection."[43]  And our court has not required a party to frame objections with exacting detail, technical precision, or citations to the precise precedent that it wants reconsidered.[44]

VIP's argument was no less developed than the argument that was preserved in *Camelot Terrace, Inc. v. NLRB*.  In that case, a heading said, "The Board Lacks Authority to Award Litigation Expenses and Bargaining Costs."[45]  This court held that the heading adequately alerted the NLRB to a challenge to its statutory remedial authority, even though the supporting argument was "no paragon of precision or detail."[46]  So too today.[47]

---

[42] *See Republic Steel Corp. v. NLRB*, 311 U.S. 7, 12 (1940) ("We have said that the power to command affirmative action is remedial, not punitive.").

[43] *Camelot Terrace, Inc. v. NLRB*, 824 F.3d 1085, 1090 (D.C. Cir. 2016) (quoting *Alwin Manufacturing Co. v. NLRB*, 192 F.3d 133, 143 (D.C. Cir. 1999)).

[44] *See, e.g.*, *id.* at 1090–91.

[45] *Id.* at 1091 (emphasis omitted).

[46] *Id.* at 1090–91 (cleaned up).

[47] The majority compares this to two other cases — one that is truly "not comparable," and another that favors VIP.

13

### III. VIP's Objection Is Ripe

By awarding monetary relief that exceeds interim earnings, the NLRB's order imposes a final, binding obligation on VIP.[48]   In response, VIP makes a purely legal argument: Section 10(c) does not permit the NLRB to impose an award

---

In *Advancepierre Foods, Inc. v. NLRB*, the ALJ had applied the precedent in question (*Mohawk*) in the petitioner's favor and the petitioner accepted that framework before the NLRB — "support[ing] , , , the ALJ's decision applying *Mohawk* in its favor."  966 F.3d 813, 819 n.6 (D.C. Cir. 2020).  It makes sense that this court would not then entertain the petitioner's facial challenge to *Mohawk* after the petitioner had implicitly affirmed that decision before the NLRB and won on that point.  *Cf. New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (discussing the rule of judicial estoppel which "prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase" (cleaned up)).  VIP has never, in any way, argued that *Thryv* applies favorably to its situation.  It challenged its foundational premise — that the NLRB has authority to award pecuniary harms — from the start.

In *Enterprise Leasing Co. of Florida v. NLRB*, the court explained Enterprise's failure this way: "Nowhere in any of its filings in the proceedings below did Enterprise argue that it was impermissibly punitive or otherwise unlawful for the Board to prevent Enterprise from collecting from its employees the dues it had failed to pay to the Union."  831 F.3d 534, 550 (D.C. Cir. 2016).  The "recoupment bar" Enterprise challenged there was not even a part of the ALJ's proposed remedy that Enterprise challenged before the NLRB.  *Id.* Every part of that description cuts the other way here.  By the very logic of *Enterprise Leasing*, VIP put the NLRB on notice of its objection to the *Thryv* remedy.

[48] JA 1734 (ordering VIP to pay employees for "any other direct or foreseeable pecuniary harms . . . regardless of whether these expenses exceed interim earnings").

14

that exceeds its equitable make-whole authority. That purely legal challenge to a final, binding order is ripe for review.[49]

True, we don't yet know the *amount* of VIP's liability. But the NLRB has *already* imposed the disputed obligation as part of its final order — to pay Christopher Bendel, among other things, "for any other direct or foreseeable pecuniary harms."[50] In that situation, when a remedy is "objectionable on its face,"[51] courts routinely review such challenges to the NLRB's remedial authority on direct petition.[52] And we should do so here, where the issue is not how much VIP will ultimately owe, but whether the Act authorizes the NLRB to impose this category of relief at all — a question no future factual development can affect.

---

[49] *Natural Resources Defense Council v. EPA*, 643 F.3d 311, 320 (D.C. Cir. 2011) ("because the Guidance is final, and because the issue raised by [the petitioner] is purely legal, the question before us is fit for judicial review").

[50] JA 1734.

[51] *Scepter, Inc. v. NLRB*, 448 F.3d 388, 391 (D.C. Cir. 2006).

[52] *See Republic Steel Corp. v. NLRB*, 311 U.S. 7, 12–13 (1940) (reviewing NLRB authority to impose a remedy requiring payments to governmental agencies); *Camelot Terrace, Inc. v. NLRB*, 824 F.3d 1085, 1089–91 (D.C. Cir. 2016) (reviewing authority to impose bargaining-costs remedy without awaiting compliance).

Notwithstanding my disagreement with the Court's conclusion that review should await compliance, I agree that VIP must be permitted to renew the challenge in a later petition for review if the NLRB enforces relief that exceeds the *King Soopers* benchmark. We cannot tell VIP that its claim is premature now if we would call it forfeited later.

15

## IV. Conclusion

The NLRB ordered recovery for "any . . . direct or foreseeable pecuniary harms."[53]  Because that provides for compensatory damages unauthorized by § 10(c) of the NLRA, I respectfully dissent from the majority's decision not to vacate that portion of the order.[54]

---

[53] JA 1734.

[54] Though I think the question is close, this court's NLRA precedents require us to deny VIP's challenge to the NLRB's conclusion that Christopher Bendel was unlawfully fired.  So I join the majority's decision to deny that part of VIP's petition.  I also join the majority's decision to vacate the NLRB's award for the three other employees fired by VIP.